B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS  Shamus Holdings, LLC<br>376 Boylston Street<br>Boston, MA 02116 | DEFENDANTS  LBM Financial, LLC<br>171 Locke Drive<br>Marlborough, MA 01752 |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Charles A. Dale, III<br>McCarter & English LLp<br>265 Franlin St., Boston, MA 02110 | ATTORNEYS (If Known) |
| PARTY (Check One Box Only)<br>☒ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor  ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Objection and Counterclaim pursuant to Section 506 and Rule 7001(2) for, among other things, a determination of the validity, priority, and extent of an alleged secured claim asserted by the Defendant.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☐ 11-Recovery of money/property - §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☐ 13-Recovery of money/property - §548 fraudulent transfer<br>☐ 14-Recovery of money/property - other | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61-Dischargeability - §523(a)(5), domestic support<br>☐ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation<br>(other than domestic support)<br>☐ 65-Dischargeability - other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☒ 21-Validity, priority or extent of lien or other interest in property | |
| **FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner – §363(h) | **FRBP 7001(7) – Injunctive Relief**<br>☐ 71-Injunctive relief – imposition of stay<br>☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | **FRBP 7001(8) Subordination of Claim or Interest**<br>3 ☒ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation | **FRBP 7001(9) Declaratory Judgment**<br>2 ☒ 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability**<br>☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims<br>☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br>actual fraud<br>☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny<br>**(continued next column)** | **FRBP 7001(10) Determination of Removed Action**<br>☐ 01-Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*<br>☐ 02-Other (e.g. other actions that would have been brought in state court<br>if unrelated to bankruptcy case) |

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 500,000 |

| Other Relief Sought<br>Declaratory judgment |
|---|

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Shamus Holdings, LLC | BANKRUPTCY CASE NO.   07-14572 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Massachusetts | DIVISION OFFICE<br>Eastern | NAME OF JUDGE<br>Feeney |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>2/11/08 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Charles A. Dale, III | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: ) | **Chapter 11** |
| ) | **Case No. 07-14572-JNF** |
| **SHAMUS HOLDINGS, LLC,** ) | |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| **SHAMUS HOLDINGS, LLC,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **Adversary Proceeding** |
| **LBM FINANCIAL, LLC,** ) | **No. _____** |
| ) | |
| Defendant. ) | |
| ) | |

## OBJECTION TO CLAIM AND COUNTERCLAIM

### Preliminary Statement

Debtor, Shamus Holdings, LLC (the "Debtor" or "Shamus") hereby brings this objection

and counterclaim pursuant to Section 506 of the United States Bankruptcy Code and Rule

7001(2) of the Federal Rules of Bankruptcy Procedure for, among other things, a determination

of the validity, priority and extent of an alleged secured claim asserted by LBM Financial, LLC

("LBM") against property of the Debtor known as Unit C-1 of the Foundry Condominium

located at 314-330 West Second Street, South Boston, Massachusetts ("the Foundry Property"),

a 6,000 square foot commercial condominium unit.  In addition, the Debtor hereby asserts

several counterclaims seeking, among other relief, a judgment against LBM for money damages.

LBM is a notorious "hard money" lender engaged in the business of lending money

primarily to real estate developers.  LBM imposes extremely high interest rates, points and

exorbitant fees on its borrowers. In addition, LBM's principal, Marcello Mallegni ("Mallegni"), routinely demands equity in the borrowers' business. When the borrower is most vulnerable, Mallegni and his agents also extort fees and other financial compensation and engage in whatever fraudulent or dishonest conduct suits their purposes even to the point of forcing third parties into bankruptcy through the pursuit of foreclosure actions predicated upon invalid mortgages.

In this case, Mallegni secured a 100% ownership stake from LBM's "borrower", 655 Corp., thereby obtaining control over its condominium development in South Boston, control which he exercises to this day. Indeed, Mallegni exercised pervasive control over 655 Corp. even after it became a Chapter 11 debtor before this Court. As further set forth below, the guaranty and mortgage upon which LBM's claim is based arise out of a sham loan transaction and are invalid on several different legal and equitable bases.

The alleged secured claim asserted by LBM in this case should be disallowed in its entirety and LBM should now be called to account for its misconduct through a judgment for money damages in favor of the Debtor.

## OBJECTION TO CLAIM

1.      On or about September 21, 2007, LBM filed a Proof of Claim ("LBM Claim") in this case, pursuant to which it seeks to recover $4,154,610.92 on account of an alleged loan transaction with 655 Corp. which loan was allegedly guaranteed by Foundry Realty LLC and secured by a mortgage against the Foundry Property. A true and accurate copy of the LBM Claim is annexed hereto and incorporated by reference herein as Exhibit A. As further set forth below, the mortgage granted by Foundry Realty was issued in connection with a sham loan transaction that was designed by Mallegni and LBM to induce General Bank (now known as Cathay Bank) to make a $5.6 million construction loan that would enable Mallegni's partner to

2.

retire his investment in the 655 Corp. condominium project. For the reasons set forth below, the

LBM Claim is voidable, unenforceable, released, discharged, and extinguished.

    2.    More specifically, Shamus hereby objects to the LBM Claim on the following

grounds:

    (a)    the mortgage upon which the LBM Claim is based is invalid and unenforceable against the Foundry Property because LBM agreed to subordinate its mortgage to a mortgage granted to a subsequent lender which subsequent mortgage was foreclosed upon in 2005 when the Debtor's predecessor acquired the property.

    (b)    the mortgage upon which the 2005 foreclosure sale was based enjoyed a priority position over the LBM mortgage. LBM and Mallegni agreed to subordinate its mortgage against the Foundry Property and they further agreed to discharge the mortgage when the 655 Corp. project reached certain construction milestones. Although LBM and Mallegni later refused to execute documents confirming their agreements, their promises are nevertheless binding pursuant to the doctrines of equitable subrogation and equitable estoppel. As a result, the 2005 foreclosure sale to Shamus' predecessor extinguished the LBM mortgage;

    (c)    the mortgage upon which the LBM Claim is based is invalid and unenforceable against the Foundry Property as it purports to secure an equity contribution, which cannot be guaranteed or secured. To the extent this equity contribution has been characterized as a "loan" by LBM, it should be recharacterized as "equity";

    (d)    the mortgage which forms the basis for the LBM Claim is invalid and unenforceable against the Foundry Property on the ground that it was obtained and maintained by fraud;

    (e)    allowing the LBM Claim would result in the unjust enrichment of LBM to the detriment of Shamus and others;

    (f)    the guaranty and mortgage underlying the LBM Claim fail for lack of consideration;

(g)   LBM has engaged in a course of inequitable, wrongful,
illegal, unfair and deceptive conduct, causing damages
to Shamus and warranting equitable subordination of the
LBM Claim and a transfer of the lien securing the LBM
Claim to the Debtor's estate.

3.     In addition, Shamus asserts the following Counterclaims.

## COUNTERCLAIMS

### PARTIES

4.     Shamus is a limited liability company duly organized and existing under the laws

of the Commonwealth of Massachusetts having a usual place of business at 376 Boylston Street,

Boston, Massachusetts.  Shamus acquired the Foundry Property from the 14 Beach Street Realty

Trust on July 19, 2007.

5.     LBM is a limited liability company duly organized and existing under the laws of

the Commonwealth of Massachusetts having a usual place of business at 171 Locke Drive,

Marlborough, Massachusetts.  At all times relevant hereto, LBM was owned and controlled by

Mallegni, its sole member and manager.  A notorious hard money lender, LBM charges its

borrowers exceptionally high interest, points and fees on each of its loans.  In addition, Mallegni

routinely demands that LBM borrowers grant him and his counsel, Michael J. Norris, an equity

stake in the borrower's business.  If and when one of LBM's borrowers defaults or becomes

vulnerable, Mallegni and Norris extort additional equity, fees and other financial gratuities as a

condition of LBM's forbearance and cooperation.

### RELATED PARTIES

6.     Foundry Realty, LLC ("Foundry Realty") is limited liability company organized

and existing under the laws of the Commonwealth of Massachusetts having a former place of

business at the Foundry Property.  Foundry Realty is an affiliate of numerous other entities

including, without limitation, 655 Corp., Platinum Investment Services, Kirsten Corp., City-

4.

Scapes L.P., SOS Realty LLC, The Geneva LLC, On Broadway Corporation, Hibel Realty LLC,

LJB Realty LLC, BF Realty Trust, Marba Corp., Main Street Brewing d/b/a Irish Times, RMB

Trust, SB Construction, 320 Corp., 1742 Liberty Street Realty LLC, Adam Corp., FB Main,

FKB, Inc., KBF Sales and Janus Development (collectively the "655 Affiliates").

7.      Bernard Laverty ("Laverty") is an individual resident of Massachusetts.

8.      Barry Queen ("Queen") is an individual resident of Massachusetts.

9.      Robert Bradley ("Bradley") is an individual resident of Massachusetts.

10.     Francis Fraine ("Fraine") is an individual resident of Massachusetts.

11.     Attorney Frank D. Kirby ("Kirby") is an individual resident of Massachusetts.

12.     Stuart Sojcher ("Sojcher") is an individual resident of Massachusetts.  At all times

relevant hereto, Sojcher was the nominal manager of Foundry Realty.

13.     Wolfpen Financial, LLC ("Wolfpen") is a limited liability corporation duly

organized and existing under the laws of the Commonwealth of Massachusetts having a usual

place of business at 171 Locke Drive, Marlborough, Massachusetts.  Like LBM, Wolfpen is a

private lender of last resort engaged in the business of lending money to individuals and entities,

primarily for real estate development.  Wolfpen's only two members were Mallegni and William

DiPietri ("DiPietri").  Mallegni is the managing member of Wolfpen.

14.     Mallegni is an individual residing at 6 Wolfpen Lane, Southborough,

Massachusetts.  At all times relevant to these proceedings, Mallegni was (i) the manager and one

of two members of Wolfpen and (ii) the sole manager and member of LBM.

15.     Attorney Michael J. Norris ("Norris") is an individual resident of Massachusetts.

16.     Attorney Vincent "J." DiMento ("DiMento") is an individual resident of

Massachusetts.

MEI 7043491v.4

## JURISDICTION AND VENUE

17.     On July 25, 2007 ("Petition Date"), Shamus commenced this bankruptcy case by

filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §157 and

§1334, this being an action arising in and related to the Title 11 case of Shamus Holdings LLC.

The objection to claim and counterclaims asserted are "core" matters, as that term is defined in

28 U.S.C. §157(b)(2), including but not limited to claims relating to disallowance of the LBM

Claim.

19.     Venue in this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.

## FACTS

### The Wolfpen Mortgage

20.     655 Corp. is a real estate development company, whose sole asset is the 18 unit

condominium development located at 653-659 East Second Street, South Boston, Massachusetts

(the "East Second Street Property"). Prior to 2002, 655 Corp. was owned and controlled by

Fraine, Bradley and Kirby.

21.     In late 2001 or early 2002, Bradley proposed to Mallegni a joint venture to

acquire and develop the "East Second Street Property". In furtherance of this joint venture, on or

about March 13, 2002, Mallegni, Dipietri, Kirby, Bradley, Fraine (who was not formally

identified as a 655 Corp. shareholder) executed an "Inducement and Shareholder's Agreement"

and a separate Stock Transfer Agreement pursuant to which Bradley, Fraine and Kirby

transferred twenty-five percent (25%) of the outstanding stock in 655 Corp. shares to Wolfpen's

only members, Mallegni and Dipietri (i.e. 12.5% each). The Inducement Agreement further

provided that Mallegni and Dipietri were to "receive … distributive funds or profits" and were to

"review and approve all contracts, loan agreements, and each and every other cost, fee, or

6.

expense associated with the development of the [East Second Street] [P]roperty."

22.     On or about March 13, 2002, the 655 Corp. shareholders, which then included

Mallegni (12.5 shares) and DiPietri (12.5 shares) executed an agreement titled the "655

Corporation Voting Trust" ("655 Trust "), pursuant to which all existing shares of 655 Corp.

stock were transferred to Mallegni, as Trustee of the trust.  Under the 655 Trust, Mallegni

possessed the "full and unqualified right and power to vote… all or any of the Trust Stock…

[and] possess[ed] and [was] entitled in his discretion to exercise all stockholders rights of every

name and nature…"  The 655 Trust was terminable only (i) upon the death of Mallegni and each

other beneficiary, (ii) by written instrument executed by the beneficial holders of at least

seventy-six  percent (76%) of 655 Corp.'s outstanding shares, or (iii) on March 14, 2007,

whichever came first.  In other words, absent the written agreement of Mallegni and DiPietri, the

655 Trust would continue in existence for five years through March 14, 2007.

23.     On or about March 13, 2002, Wolfpen loaned $2,275,000 to 655 Corp. pursuant

to a written promissory note ("Wolfpen/655 Note").  The Wolfpen/655 Note had a term of six

months and therefore, became due and payable in September, 2002.  655 Corp. secured the

Wolfpen/655 Note with a mortgage against the East Second Street Property ("Wolfpen

Mortgage").  Fraine, Bradley and Kirby personally guaranteed the Wolfpen/655 Note.  On

Broadway Corp. also guaranteed the Wolfpen/655 Note and collateralized its guarantee with a

mortgage of its property at 420 West Broadway, South Boston, Massachusetts.

**The FIG Mortgage**

24.     Upon information and belief, Faneuil Investors Group Limited Partnership

("FIG") is a limited partnership in the business of real estate development and finance.  Prior to

May 22, 2002, FIG owned the Foundry Property.

7.

25.     On or about May 22, 2002, FIG sold the Foundry Property to Foundry Realty for a purchase price of $600,000.  On or about May 22, 2002, Foundry Realty granted FIG a first priority mortgage on the Foundry Property ("FIG Mortgage") to secure $540,000 of the purchase price.

### General Bank and the LBM Mortgage

26.     In the Fall of 2002, 655 Corp. approached General Bank for a $5,600,000.00 construction loan with which to complete the construction and development of the East Second Street Property.  At that time, 655 Corp. indicated to General Bank that its principal owners were Mallegni and DiPietri.

27.     General Bank, through its Senior Vice President, Linda Moulton, recommended the loan for approval on the condition that 655 Corp. would invest $1,200,000.00 of equity in the project.  General Bank approved the loan, among other things, on the strength of the relationship it wanted to develop with Mallegni.  While the General Bank loan was supposed to provide 655 Corp. with sufficient funds to complete construction at the East Second Street Property, it would only accommodate $1,598,000 with which 655 Corp. could pay Wolfpen.  At the time, DiPietri was insisting that his portion of the Wolfpen/655 Note be repaid.  Mallegni agreed that the funds available from the General Bank loan (i.e. $1,598,000) would repay DiPietri and that $1,200,000 of his interest in the Wolfpen loan would remain in the East Second Street Property as equity.

28.     Upon information and belief, Mallegni (like Fraine) did not want it to be generally known that he was an owner of 655 Corp.  In the Spring of 2003, Queen and Laverty were installed as the nominal owners and officers of 655 Corp.  Queen and Laverty played similar roles with numerous other Affiliates.

29.     On May 9, 2003, Mallegni and 655 Corp. documented a sham loan transaction

ME1 7043491v.4

which gave the appearance of a $1,200,000 capital infusion into the East Second Street project but which maintained Mallegni's senior position in the capital structure of 655 Corp. Specifically, 655 Corp. issued a Promissory Note to LBM in the original principal sum of $1,200,000 ("LBM/655 Note"), together with a mortgage against the East Second Street Property. Even though the East Second Street project would not be completed for more than a year and even though the anticipated loan from General Bank was for an initial term of two years, the LBM/655 Note matured only four months after it was issued on September 9, 2003, a date that was later extended through April 9, 2004.

30.     On May 9, 2003, Foundry Realty executed a "guaranty" of the LBM/655 Note (the "Foundry Guaranty"). Foundry also granted LBM a mortgage against the Foundry Property to secure the Foundry Guaranty ("LBM Mortgage"). LBM agreed to discharge the LBM Mortgage and certain other collateral including Laverty's and Fraines's homes upon completion of the lobby and elevator at the East Second Street Property.

31.     Foundry received no consideration in exchange for either the Foundry Guaranty or the LBM Mortgage.

32.     By letter dated May 11, 2003, Queen advised General Bank that:

> This letter is to confirm that as of the above date 655 Corporation paid the sum of ONE MILLION TWO HUNDRED THOUSAND ($1,200,000.00) DOLLARS in good funds to WolfPen Financial in partial retirement of the $2,800,000.00 current financing on the building located at 653-655 East Second Street, S. Boston, MA 02127. The partial retirement is in anticipation of the construction loan to be placed on the building by your financial institution for the construction and sale of 18 condominiums. It is my understanding with WolfPen that upon your financial institution tendering ONE MILLION FIVE HUNDRED NINETY EIGHT THOUSAND FIVE HUNDRED ($1,598,500.00) DOLLARS to WolfPen a full discharge of their mortgage will be recorded.

33.     On May 12, 2003, LBM purported to fund the alleged loan evidenced by the

9.

LBM/655 Note by delivering a check in the amount of $1,200,000 to Norris, its closing attorney

who deposited the funds into his IOLTA account. That same day, Norris issued a $2,815,000.00

check payable to Wolfpen as payoff for the Wolfpen/655 Note. Upon information and belief,

that check was not delivered until after the General Bank Loan was funded on May 14, 2003.

34.    Notwithstanding the fact that Mallegni and DiPietri were each 50% members of

Wolfpen, on May 13, 2003, Wolfpen issued a check in the amount of $1,391,100.39 to LBM and

a second check in the same amount to Rosewood Development (an affiliate of DiPietri). Upon

information and belief, these checks were not delivered until after the General Bank Loan was

funded on May 14, 2003.

35.    On May 14, 2003, General Bank closed the $5,600,000 construction loan with

655 Corp. ("General Bank Loan"). From the initial loan proceeds, $1,598,000 was wired by

General Bank to Norris, who then delivered to Wolfpen the check for $2,815,000. The Wolfpen

check to LBM for $1,391,100.39 cleared into LBM's account on May 16, 2003. As a result of

this series of checks, LBM recovered more than 115% of its alleged $1,200,000 "loan" to 655

Corp. within four calendar days after it allegedly funded it.

36.    Under the Construction Loan Agreement with General Bank, 655 Corp. could not

borrow money or encumber the East Second Street Property without the prior written consent of

General Bank. In addition, any funds advanced to the project by the owners of 655 Corp. were

required to be made in the form of equity. Despite these clear (and customary) negative

covenants, LBM recorded a mortgage against the East Second Street Property on May 14, 2003

and seven (7) subsequent mortgages.

37.    The General Bank Loan was secured by: (a) a first mortgage against the East

Second Street Property ("General Bank Mortgage"); and (b) a second mortgage against the

Foundry Property (subordinate only to the FIG Mortgage). The General Bank Loan was due and payable in two years on May 14, 2005.

38.     Like LBM, General Bank agreed to discharge its mortgage against the Foundry Property and other collateral, including Laverty's and Fraine's homes upon completion of the lobby and elevator at the East Second Street Property. When the lobby and elevator were completed in 2006, General Bank released its mortgage against the Foundry Property and other properties, but LBM did not.

39.     Mallegni remains the controlling shareholder of 655 Corp. to this day. In fact, by written agreement dated August 11, 2006, LBM installed DiMento to oversee the completion and sale of the East Second Street project. Since 2002, DiMento has been a business partner in several real estate projects with Mallegni and he has periodically provided legal counsel to Mallegni and/or LBM as well.

### The Pine Banks Mortgage

40.     Upon information and belief, after the FIG Note matured, FIG threatened to foreclose upon the Foundry Property unless it was paid. As a result, Foundry Realty sought refinancing for the FIG Note and Mortgage.

41.     In or about November 2003, Charles J. Housman, Trustee of the Pine Banks Nominee Trust ("Pine Banks") agreed to refinance the FIG Note and Mortgage. Pine Banks was at all times relevant to these proceedings represented by Attorney Steven A. Ross ("Ross").

42.     In connection with the Pine Banks loan, Mallegni and Norris represented to Ross, Laverty and Sojcher that LBM would subordinate the LBM Mortgage to the proposed mortgage loan from Pine Banks.

43.     General Bank also agreed to subordinate its mortgage against the Foundry

Property to the proposed mortgage loan from Pine Banks.

44.   In reliance upon the agreement of LBM and General Bank to subordinate their respective mortgages against the Foundry Property, on or about November 12, 2003, Pine Banks loaned Foundry Realty $760,000.  In connection therewith, Pine Banks was granted a mortgage on the Foundry Property ("Pine Banks Mortgage"), a mortgage that Ross and Pine Banks believed would be a first priority lien against the property.

45.   The proceeds of the Pine Banks/Foundry Note were used to satisfy the FIG Note and Mortgage.   In consideration of that payment, the FIG Mortgage was discharged.

46.   On or about November 14, 2003, General Bank executed a written subordination agreement pursuant to which General Bank subordinated its mortgage on the Foundry Property to the mortgage granted to Pine Banks.  Pine Banks and Ross relied upon Sojcher to memorialize the subordination with both General Bank and LBM.  Although General Bank honored its commitment, LBM did not (and later refused to) deliver a written subordination agreement in favor of Pine Banks.

### The Other LBM/655 Loans

47.   The LBM/655 Note matured on April 9, 2004.  Thereafter and while the LBM/655 Note was in default, LBM made no less than six (6) subsequent loans to 655 Corp. and no less than ten (10) loans to various 655 Affiliates.  Loans to 655 Corp. were made on the following dates and in the following amounts:

- March 12, 2004 for $2,000,000;

- April 7, 2004 for $418,500;

- April 7, 2005 for $850,000;

- January 27, 2006 for $2,432,000;

12.

- September 20, 2006 for $43,735 (debtor-in-possession financing); and

- November 10, 2006 for $2,000,000 (debtor-in-possession financing) (collectively, the "Other LBM/655 Loans").

48.     A portion of the January 2006 loan refinanced and consolidated the April 2004 and the April 2005 loans.

49.     655 Corp. requested that LBM consolidate the Other LBM/655 Loans with the $1,200,000 LBM/655 Note, but LBM refused.

50.     In total, LBM purported to loan 655 Corp. over $6,000,000 (including debtor-in-possession financing) *after* the LBM/655 Note was in default.

### Hibel Realty LLC

51.     One of the 655 Affiliates, Hibel is a limited liability company engaged in the business of real estate development in Hyannis, Massachusetts.  Its members have included Mallegni, DiMento, Laverty and Bradley.

52.     Since December 2003, LBM purports to have made the following loans to Hibel in the following amounts:

- December 22, 2003 for $675,000;

- March 12, 2004 for $2,000,000 (co-maker on the 655 Corp. loan of even date);

- April 27, 2005 for $510,000;

- March 17, 2006 for $1,330,000; and

- February 16, 2007 for $3,530,000 (collectively, the "LBM/Hibel Loans").

53.     The LBM/Hibel Loans were secured by mortgages on Hibel's real estate in Hyannis, Massachusetts and by guarantees and mortgages against property owned by numerous other 655 Affiliates.

ME1 7043491v.4

54.    The February 2007 loan refinanced and consolidated the December 2003, April 2005, and March 2006 loans.

55.    In total, LBM purports to have loaned Hibel approximately $3,530,000 *after* the LBM/655 Note was in default.

### SOS Realty, LLC

56.    Another 655 Affiliate, SOS is a limited liability company engaged in the business of real estate development in West Roxbury, Massachusetts. Its members have included Laverty, Queen and DiMento.

57.    SOS was formed to develop the property located at Washington Street, West Roxbury, Massachusetts ("Washington Street Property") into approximately 48 residential condominiums.

58.    LBM purports to have made numerous loans to SOS to fund the development of the Washington Street Property, including but not limited to:

- September 3, 2004 for $400,000;

- January 10, 2005 for $100,000;

- January 26, 2005 for $300,000;

- June 16, 2005 for $500,000; and

- September 21, 2005 for $500,000 (collectively, the "LBM/SOS Loans").

59.    Each of the LBM/SOS loans was secured by a junior mortgage against the Washington Street Property and by guarantees and mortgages against property owned by numerous other 655 Affiliates. Framingham Cooperative Bank provided senior construction financing to SOS secured by a first mortgage against the Washington Street Property.

60.    In total, LBM purports to have loaned SOS approximately $1,800,000 *after* the

ME1 7043491v.4

LBM/655 Note was in default.

61.     Upon information and belief, SOS sold approximately 16 condominium units at the Washington Street Property prior to its bankruptcy filing. Pursuant to a written intercreditor agreement, upon the sale of each condominium at the Washington Street Property, Framingham Cooperative Bank and LBM were each paid a portion of the sale proceeds on account of their respective mortgage loans.

62.     Taking full advantage of a powerless borrower, in connection with each of the partial releases obtained by SOS, Mallegni demanded from SOS and was paid an additional, personal fee of $5,000 upon the sale of each condo unit, including but not limited to, Units 101, 103, 104, 107, 202, 204, 302, 303, which were sold between August 31 and September 16, 2005. These personal fees were extorted from SOS even though LBM's loan documents do not provide for such fees.

### The Quincy Condominium

63.     In August 2004, after the LBM/655 Note matured and was in default, Norris informed Laverty that if he (Laverty) did not assist in the purchase of a condominium for Norris' daughter, Heidi, he (Norris) would ensure that LBM would provide no more funding or forbearance to 655 Corp. or any 655 Affiliate for any of their developments.

64.     Acquiescing to Norris' demand, on August 31, 2004, Laverty purchased a residential condominium located at Unit D-8, 123 Elm Street, Quincy, Massachusetts (the "Quincy Condominium") for $175,000. Later that same day, Laverty sold the Quincy Condominium to Heidi Norris. Although the deed currently on record states that Heidi Norris paid Laverty $165,000 for the Quincy Condominium (only $10,000 less than Laverty paid), upon information and belief, Heidi Norris only paid Laverty $150,000 for the Quincy Condominium.

15.

65.     Salem Five Cents Savings Bank loaned Heidi Norris $160,000 to purchase the Quincy Condominium, which upon information and belief, is more than 100% of the purchase price she actually paid for the property.

66.     Norris represented both Heidi Norris and Salem Five Cents Savings Bank in connection with the Quincy Condominium transaction.

67.     At the time of the Quincy Condominium closings, the LBM/655 Note was in default and LBM was refusing to acknowledge its prior agreement to discharge the Foundry Mortgage or the mortgages against Laverty's and Fraine's homes upon completion of the elevator and lobby at the East Second Street Property.  Under the circumstances, Laverty was in no position to refuse Norris' illegal and outrageous demands.

**The Pine Banks Foreclosure**

68.     In early 2005, Foundry Realty defaulted on its loan obligations to Pine Banks.  On or about July 7, 2005, Pine Banks foreclosed upon the Pine Banks Mortgage.  Pine Banks was the highest bidder at the foreclosure auction.

69.     LBM had notice of the 2005 foreclosure by Pine Banks, yet made no effort to communicate with Pine Banks.

70.     Following its foreclosure sale, Pine Banks sold the Foundry Property to Steven Ross, as Trustee of the 14 Beach Street Realty Trust.  The Beach Street Trust later conveyed the Foundry Property to Shamus on July 19, 2007.

**LBM Attempts to Foreclose on the LBM Mortgage.**

71.     Nearly two years following the foreclosure sale of the Foundry Property by Pine Banks, and notwithstanding (i) the agreement by LBM to subordinate its mortgage to the Pine Banks mortgage and (ii) its further agreement to discharge the Foundry mortgage when the

16.

elevator and lobby were complete at the East Second Street property, LBM initiated foreclosure proceedings against the Foundry Property and scheduled an auction sale of the property for July 26, 2007. The foreclosure sale was preempted by Shamus' bankruptcy filing on July 25, 2007.

### Mallegni's Pervasive Control Over 655 Corp. and the 655 Affiliates

72.     For a variety of reasons, including the systematic diversion of funds by 655 Corp., Fraine and others, the condominium projects at East Second Street, Washington Street (owned by SOS), West First Street (owned by Geneva) and Main Street in Hyannis (owned by Hibel) stalled and in some cases were foreclosed upon. 655 Corp. and at least two of the 655 Affiliates filed Chapter 11 petitions in this Court (655 Corp; Case No. 03-13020; The Geneva LLC; Case No. 06-1138; and SOS Realty LLC, Case No. 06-11854).

73.     In order to quietly maintain control over these developments while they attempted to "reorganize", Mallegni installed his former lawyer and long time business partner DiMento as the Manager of 655 Corp., SOS Realty and Hibel. Attorney DiMento continues to serve in that role today.

### COUNT I

### (Declaratory Judgment)

74.     Shamus realleges and repeats the allegations contained in paragraphs 1 through 73 above and by reference incorporates them herein.

75.     An actual controversy exists between Shamus and LBM with respect to validity, priority and extent of the LBM Mortgage that serves as the basis for LBM's Claim based upon the following grounds, among others:

> a.     The LBM Mortgage is invalid and unenforceable against the Foundry Property on the grounds that LBM agreed to subordinate the LBM Mortgage to the Pine Banks Mortgage in November 2003;

17.

b.  The LBM Mortgage is invalid and unenforceable against the Foundry Property on the grounds that the Pine Banks Mortgage enjoyed a priority position over the LBM Mortgage under the doctrine of equitable subrogation, and the subsequent foreclosure sale to Shamus (or its predecessor, Beach Street Trust) extinguished the LBM Mortgage;

c.  The LBM Mortgage is invalid and unenforceable against the Foundry Property on the grounds that it was obtained by fraud;

d.  The LBM Mortgage is invalid and unenforceable against the Foundry Property based upon the doctrine of equitable estoppel;

e.  The LBM Mortgage is invalid and unenforceable against the Foundry Property on the grounds that it purports to secure a guaranty of "loan" by LBM to 655 Corp. that was, in fact, a capital contribution which, in turn, cannot be guaranteed or secured; alternatively, the "loan" underlying the LBM Foundry Guaranty of the LBM/655 Note should be recharacterized under the circumstances existing here;

f.  The LBM Mortgage is invalid and unenforceable against the Foundry Property on the grounds that the LBM Mortgage and the underlying debt it secures, namely,  the Foundry Guaranty, fail for lack of and/or insufficiency of, consideration;

g.  LBM breaches it agreement to subordinate the LBM Mortgage to the Pine Banks Mortgage;

h.  LBM breaches it agreement to discharge the LBM Mortgage upon the completion of the elevator banks and the lobby at the East Second Street Property.

## COUNT II

### (Breach of Contract)

76.     Shamus realleges and repeats the allegations contained in paragraphs 1 through 75 above and by reference incorporates them herein.

77.     Pine Banks and LBM entered into an agreement pursuant to which LBM agreed to subordinate the LBM Mortgage to the Pine Banks Mortgage.

78.     LBM has failed and refused to acknowledge the subordination of the LBM Mortgage to the Pine Banks Mortgage.

79.     LBM's conduct has caused and will continue to cause harm to Shamus in an

18.

amount to be determined at trial.

## COUNT III

### (Breach Implied Covenant of Good Faith and Fair Dealing)

80.     Shamus realleges and repeats the allegations contained in paragraphs 1 through 79

above and by reference incorporates them herein.

81.     The contractual relationship between Pine Banks and LBM carries with it an

implied covenant of good faith and fair dealing.

82.     LBM, by its conduct, has breached the implied covenant of good faith and fair

dealing owed to Pine Banks and its successors-in-interest, including Shamus.

83.     LBM's conduct has caused and will to continue to cause harm to Shamus in an

amount to be determined at trial.

## COUNT IV

### (Unjust Enrichment)

84.     Shamus hereby repeats and realleges the allegations contained in paragraphs 1

through 83 above and by reference incorporates them herein.

85.     LBM agreed (i) to discharge the LBM Mortgage upon completion of the lobby

and elevator at the East Second Street Property, and (ii) to subordinate the LBM Mortgage to the

Pine Banks Mortgage.

86.     Shamus acquired the Foundry Property with the reasonable expectation that LBM

would subordinate the LBM Mortgage to the Pine Banks Mortgage.

87.     LBM has failed and refused to subordinate the LBM Mortgage to the Pine Banks

Mortgage or acknowledge its obligation to discharge upon completion of the lobby and elevator

at East Second Street.

88.     LBM's failure to either discharge the LBM Mortgage or subordinate the LBM

MEI 7043491v.4

Mortgage to the Pine Banks Mortgage has unjustly enriched LBM.

## COUNT V

### (Fraud)

89.     Shamus hereby repeats and realleges the allegations contained in paragraphs 1 through 88 above and by reference incorporates them herein.

90.     LBM repeatedly misrepresented to Ross and Pine Banks that it would subordinate the LBM Mortgage to the Pine Banks Mortgage.

91.     LBM's misrepresentations were material.

92.     LBM's misrepresentations were made with the intention that Pine Banks rely upon them.

93.     Pine Banks reasonably relied upon the misrepresentations of LBM to its detriment.

94.     LBM's misrepresentations have caused and will continue to cause harm to Shamus in an amount to be determined at trial.

## COUNT VI

### (Equitable Subrogation)

95.     Shamus realleges and repeats the allegations contained in paragraphs 1 through 94 above and by reference incorporates them herein.

96.     The FIG Note and Mortgage were granted on May 22, 2002.

97.     The LBM Mortgage, granted on May 9, 2003, was subordinate to the FIG Mortgage.

98.     In November 2003, Pine Banks loaned Foundry Realty the sum of $760,000.

99.     Thereafter, $565,451.07 of the Pine Banks loan proceeds were used by Foundry Realty to pay off the FIG Note and retire the FIG Mortgage.

20.

100.   Pine Banks made the payment to protect its own interest.

101.   Pine Banks, in making the payment to Foundry Realty, did not act as a volunteer.

102.   Pine Banks was not primarily liable for the FIG Note and Mortgage.

103.   The proceeds of the Pine Bank loan paid off the entirety of the FIG Note and Mortgage.

104.   Subrogation of Pine Banks rights to FIG's rights would not work any injustice upon LBM.

105.   Shamus now owns the Foundry Property.

106.   The junior LBM Mortgage was extinguished by this foreclosure sale

107.   An actual controversy exists between Shamus and LBM with respect to existence of the LBM Mortgage that serves as the basis for LBM's Claim.

## COUNT VII

### (Recharacterization)

108.   Shamus realleges and repeats the allegations contained in paragraphs 1 through 107 above and by reference incorporates them herein.

109.   The LBM/655 Note should be recharacterized as equity.

110.   Development of the East Second Street Property was a joint venture between Mallegni and the other shareholders of 655 Corp.  Mallegni, the managing member of LBM, was an insider of 655 Corp. when the LBM/655 Note was issued.  He was a shareholder and effectively controlled 655 Corp. as trustee of the Voting Trust.  Mallegni maintains control over 655 Corp. through the present time.

111.   General Bank, an outside lender, was unwilling to make a construction loan to 655 Corp. without the infusion of $1,200,000 in equity.

112.   LBM and 655 Corp. executed loan documents on May 9, 2003, but no actual loan

21.

was made.

113.   The LBM/655 Note was not treated as a loan either by LBM or 655 Corp.

114.   The LBM/655 Note had payment provisions, but 655 Corp. never made any payments on the LBM/655 Note.

115.   Even though the development and sale of the East Second Street Property would take several years, the LBM/655 Note had a term of only four months.

116.   Mallegni, through LBM, continued to loan money to 655 and its related entities long after the LBM/655 Note was in default.

117.   Accordingly, the LBM Claim should be disallowed to the extent that it relies upon the LBM/655 Note and/or the LBM Mortgage.

## COUNT VIII

### (Failure of Consideration)

118.   Shamus realleges and repeats the allegations contained in paragraphs 1 through 117 above and by reference incorporates them herein.

119.   The Foundry Guaranty and the underlying LBM Mortgage on the Foundry Property fail for lack of consideration.  Absent consideration, the Foundry Guaranty and the LBM Mortgage are void or voidable.

120.   Accordingly, the LBM Claim should be disallowed to the extent that it relies upon the LBM/655 Note and/or the LBM Mortgage.

## COUNT IX

### (Equitable Estoppel)

121.   Shamus realleges and repeats the allegations contained in paragraphs 1 through 120 above and by reference incorporates them herein.

122.   LBM represented that it would subordinate the LBM Mortgage to the Pine Banks

22.

ME1 7043491v.4

Mortgage and that it would discharge the LBM Mortgage when the lobby and elevator were completed at the East Second Street Property.

123.   These representations were reasonably relied upon by Shamus, or it predecessors in interest.

124.   LBM is estopped from asserting the LBM Mortgage as a basis for the LBM Claim.

## COUNT X

### (Violation of G.L. c. 93A - Unfair and Deceptive Acts and Practices)

125.   Shamus realleges and repeats the allegations contained in paragraphs 1 through 124 above and by reference incorporates them herein.

126.   LBM and its principal, Mallegni, have engaged in trade and commerce within the Commonwealth of Massachusetts, and the acts, which are unfair and deceptive, that give rise to this claim occurred substantially within the Commonwealth.

127.   LBM's conduct and the conduct of its principals and agents, including Mallegni and Norris have been unfair and deceptive.

128.   The unfair acts and practices of LBM, as set forth above, constitute part of a pattern of customs and practices by LBM.

129.   LBM's conduct has been willful and intentional, entitling Shamus to recover treble the amount of actual damages plus costs, including reasonable attorneys' fees.

**WHEREFORE**, Shamus Holdings, LLC respectfully requests that this Court enter the following relief:

1.   Disallow the claim of LBM Financial, LLC;

2.   Enter an order, pursuant to 11 U.S.C. §510(c), transferring the LBM Mortgage against the Foundry Property to the Debtor's bankruptcy estate;

23.

3.      Enter judgment for Shamus and against LBM Financial, LLC on each of Shamus'

Counterclaims;

4.      Enter judgment for Shamus and against LBM Financial, LLC for damages

resulting from the unfair and deceptive acts and practices of LBM Financial, LLC;

5.      Treble such damages for the willful and intentional conduct of LBM Financial,

LLC;

6.      Award Shamus all costs, including attorneys' fees; and

7.      Order such other and further relief as this Court deems just and proper.


SHAMUS HOLDINGS, LLC,
By its counsel,

/s/ Charles A. Dale III
Charles A. Dale III, BBO #558839
David M. Ianelli, BBO #567274
Kara A. Lynch, BBO #659920
Mackenzie L. Shea, BBO #666241
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, MA  02110
617.449.6500

February 11, 2008

ME1 7043491v.4