UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>SHAMUS HOLDINGS, LLC,<br><br>　　　　　　Debtor. | Chapter 11<br>Case No. 07-14572 (JNF) |
| SHAMUS HOLDINGS, LLC<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>LBM FINANCIAL, LLC<br><br>　　　　　　Defendant. | Adversary Pro. No. 08-01030 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF LBM FINANCIAL, LLC
TO DISMISS THE OBJECTION TO CLAIM AND COUNTERCLAIM**

**INTRODUCTION**

Shamus seeks affirmative relief against LBM despite the fact that Shamus never had any business dealings with LBM, never entered into a contract with LBM, and never made any payments to LBM.  Instead, it adopts the role of police officer, seeking to right the alleged wrongs LBM is accused of perpetrating upon others including Foundry Realty, LLC ("Foundry"), Pine Banks Nominee Trust ("Pine Banks"), 655 Corp., Hibel Realty, LLC ("Hibel"), SOS Realty LLC ("SOS"), and Bernard J. Laverty, Jr. ("Laverty").  Even if LBM engaged in wrongdoing, Shamus has no right to enforce the resulting claims held by other parties to which it has no contract or connection and from which it received no assignment. Shamus's rights and remedies are limited to the actions personal to Shamus.

All of the actions described in the Objection and Counterclaim took place years before

Shamus came into existence.  LBM's $1,200,000.00 loan to 655 Corp., Foundry's guaranty of

that loan, Foundry's granting of a mortgage to secure that loan, and LBM's alleged promises to

Pine Banks all occurred between May 2003 and November 2003, twenty months or more before

the Pine Banks' foreclosure sale which resulted in the transfer of certain real estate to the 14

Beach Street Realty Trust ("Beach Street").  Although Beach Street ultimately transferred title to

Shamus two years later on July 19, 2007, neither Beach Street nor Shamus had any contact with

LBM, thus eliminating the opportunity for LBM to make any actionable representations or other

promises to them.  Moreover, the title to the property at the time Shamus acquired it clearly

indicated that LBM's mortgage remained on record.

Under these circumstances, and those alleged in the Objection and Counterclaim, Shamus

holds no viable claims for affirmative relief against LBM and it has no standing to pursue the

claims held by others.  To the extent that Shamus does have standing, the counts of the

Counterclaim fail because they do not seek relief which the Court may grant.  This is so

principally because Shamus has suffered no loss, harm, or damage as a result of LBM's actions

or the debt incurred by 655 Corp. and Foundry.

For these reasons, as more fully explained below, the Objection and Counterclaim must

be dismissed to the extent that it seeks relief based on claims held by others and does more than

simply challenge the amount due (if anything) under the debt held by LBM.

### **STANDARD OF REVIEW**

A motion to dismiss based on a challenge to a plaintiff's standing will ordinarily be

viewed as a challenge to the Court's subject matter jurisdiction over the cause of action under

Fed.R.Civ.P. 12(b)(1).  See United Seniors Assoc., Inc. v. Phillip Morris USA, 500 F.3d 19, 23

(1st Cir. 2007) (a challenge to standing calls the Court's jurisdiction into question and must be

analyzed under Fed.R.C.V.P 12(b)(1)); Tasini v. New York Times Company, Inc., 184

F.Supp.2d 350, 354-55 (S.D.N.Y. 2002); See also Venice-Oxford Associates Limited Partnership

v. Multifamily Mortgage Trust 1996-1 and LaSalle National Bank, (In re Venice-Oxford

Associates Ltd. Partnership) 236 B.R. 814, 817 (Bankr. M.D.Fla. 1998) ("A motion to dismiss

based on a plaintiff's lack of standing may be considered under either rule 12(b)(1) or rule

12(b)(6)").   In the event that the motion involves a "facial" or "sufficiency" challenge to the

pleadings, then all facts plead by the plaintiff are taken as true for the purpose of the motion.

Valentin v. Hospital Bella Vista, 254 F.3d 358, 363-364 (1st Cir. 2001).  See Tasini, 184

F.Supp.2d at 354.  Notwithstanding this presumption, the plaintiff bears the burden to establish

its standing to prosecute the action.  See Excel Home Care, Inc. v. United States Dept. of Health

and Human Services, 316 B.R. 565, 567 (Bankr. D. Mass. 2004);  Tasini, 184 F.Supp 2d at 355;

Venice-Oxford, 236 B.R. at 818.

An action should be dismissed pursuant to Rule 12(b)(6) where it is unmistakable that the

plaintiff has failed to state a claim for relief that is plausible on its face.  Bell Atlantic Corp. v.

Twombly, 127 S.Ct 1955, 1959, 1965 (2007) ("[f]actual allegations must be enough to raise a

right to relief above the speculative level").  For purposes of a motion to dismiss under Rule

12(b)(6), the court must take the plaintiff's allegations as true and take all reasonable inferences

in favor of the plaintiff.  See Pujol v. Shearson/American Express, Inc., 829 F.2d. 1201, 1202 (1st

Cir. 1987); see also Billingham v. Simpson (In re Simpson), 334 B.R. 298, 302-03

(Bankr.D.Mass. 2005) (quoting, Garita Hotel, Ltd v. Ponce Federal Bank, 958 F.2d 15, 17 (1st

Cir. 1992)) ("For purposes of this analysis, this Court must 'take the factual averments contained

in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause'.").

The Court is "not bound, however, to credit 'bald assertions, unsupportable conclusions and

opprobrious epithets' woven into the fabric of the complaint." In re Colonial Mortgage Bankers

Corp. v. Lopez-Stubbe, 324 F.3d 12, 15 (1st Cir. 2003) (quoting, Chongris v. Bd. of Appeals,

811 F.2d 36, 37 (1st Cir. 1987)).

In light of the foregoing standards, and for purposes of this motion only, LBM recites the

facts alleged by Shamus in the Objection and Counterclaim as if they were true, but specifically

reserves and retains the right to contest those allegations throughout this litigation.

## FACTUAL BACKGROUND

The facts, events and circumstances alleged in the Objection and Counterclaim occurred

during the period between the Spring of 2003 and the Summer of 2005. See Objection and

Counterclaim, ¶¶ 26-73. They arise out of a complex series of loans and other transactions

involving LBM, 655 Corp., and several of 655 Corp.'s affiliates, including Foundry. See id.

On or about May 12, 2003, LBM advanced $1.2 million to 655 Corp. which executed a

promissory note (the "LBM/655 Note") to memorialize its obligation to LBM. See Objection

and Counterclaim, ¶¶ 29, 33 and Exhibit C to Exhibit A (Proof of Claim). 655 Corp. used the

funds advanced by LBM to retire a portion of its outstanding debt to Wolfpen Financial, LLC.

See Objection and Counterclaim, ¶ 33.

Foundry was an affiliate of 655 Corp. at the time the LBM/655 Note was executed. See

id., ¶ 6. To secure satisfaction of the LBM/655 Note, Foundry executed a Guaranty (the

"Foundry Guaranty") of that debt and also granted LBM a third mortgage (the "LBM

Mortgage") on its real property located at Unit C-1, Foundry Condominium, 314 West Second

Street, South Boston, Massachusetts (the "Foundry Property"). See id., ¶ 30. Both the Foundry

Guaranty and the LBM Mortgage were executed under seal on or about May 9, 2003. See id.,

Exhibits B and D to Exhibit A (Proof of Claim).

Shamus alleges that LBM agreed with Foundry to release the LBM Mortgage upon certain benchmarks being met with respect to the construction at the property owned by 655 Corp., an agreement that was never executed in writing. See id., ¶ 38. Shamus does not allege that Foundry ever brought an action seeking to enforce any alleged agreement. Instead, it simply notes that General Bank (which also provided funds to 655 Corp. guarantied by Foundry and secured by a second mortgage on the Foundry Property) entered into such an agreement with Foundry and apparently released its mortgage when the benchmarks were met. See id.

In November 2003, Pine Banks engaged in a loan transaction with Foundry in which Pine Banks advanced funds sufficient to satisfy the debt underlying the first mortgage recorded against the Foundry Property held by Fanueil Investors Group Limited Partnership ("FIG"). See id. ¶ 44. In doing so, Pine Banks intended to obtain a first mortgage position by securing subordination agreements from LBM and General Bank which held the second and third mortgage. See id., ¶¶ 42-44. Pine Banks did not obtain and record a written subordination agreement from General Bank. See id., ¶ 46. Prior to advancing funds for the benefit of Foundry, Pine Banks allegedly obtained an oral commitment from LBM to subordinate the LBM Mortgage to the new Pine Banks Mortgage which was never reduced to writing. See id., ¶ 46. LBM is alleged to have breached that commitment. See id.

When Foundry defaulted under the obligation secured by the Pine Banks mortgage, Pine Banks conducted a foreclosure sale of the Foundry Property. See id., ¶ 68. Shamus alleges that LBM had notice of the foreclosure sale and that Beach Street was the successful bidder. See id., ¶ 70. Beach Street subsequently acquired the Foundry Property by way of a foreclosure deed from Pine Banks. See id.

Shamus claims that no payments were ever made under the LBM/655 Note which went into default shortly after it was executed.  See id., ¶¶ 50-55.  Despite that default, LBM continued to provide financing to 655 Corp. and a number of its affiliates, including Hibel and SOS.  See id., ¶¶ 47-62.  Shamus also claims that LBM's managing member, Marcello Mallegni, owned and controlled 655 Corp.  See id., ¶¶ 22, 39.  In a somewhat contradictory position, Shamus also alleges that LBM refused to accommodate 655 Corp. demands for relief under various loan arrangements.  See id., ¶ 49.

Shamus was first incorporated on July 19, 2007, and did not exist prior to that time.  See Affidavit of Counsel, Ex. A (Shamus Articles of Incorporation).[1]  On the day it was created, Shamus acquired the Foundry Property from Beach Street in exchange for the consideration of one dollar ($1.00).  See id. Ex. B (Deed from Beach Street to Shamus).  At that time, any review of the title to the Foundry Property would have revealed that the LBM Mortgage remained outstanding as the first mortgage of record.  See Objection and Counterclaim, ¶ 46.  Also at that time, Steven Ross, (the managing member of Shamus, counsel to Pine Banks, and Trustee of Beach Street), had actual knowledge of the existence of the LBM Mortgage and LBM's position with respect to the continued validity and existence of the LBM Mortgage.  See id.

---

[1] Because the date of the Debtor's incorporation and its acquisition of the Foundry Property are referenced and relied upon in the Objection and Counterclaim (¶¶ 4, 70), the Certificate of Incorporation for, and the Deed into Shamus are "merge[d] into the pleadings" and can be considered without converting this motion into one for summary judgment.  See Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) (quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994)); see also 2 James Wm. Moore et al, Moore's Federal Practice § 12.34 (3d ed. 1997) ("undisputed documents alleged or referenced in the complaint" may be considered in 12(b)(6) motion); Waterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993); Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33-34 (1st Cir. 2001) ("Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.").

Notwithstanding these facts, Shamus had no business or other dealings with LBM during the six-day period after Shamus's formation and before its bankruptcy filing.   Shamus does not allege that it entered into any contract or other agreement with LBM during this time.  Nor does it allege that LBM made any representations or any other statements to it during this time.

## ARGUMENT

I. **SHAMUS HAS NO STANDING TO PROSECUTE THE COUNTERCLAIM OR TO ASSERT ANY OBJECTION TO LBM'S CLAIM BASED ON THE CAUSES OF ACTION ITERATED IN THE COUNTERCLAIM**.

LBM did nothing to harm, injure or otherwise damage Shamus.  Shamus acquired the Foundry Property with full knowledge of LBM's first mortgage position and it spent only one dollar to do so.  While it certainly has the right to challenge the amount due under the secured claim held by LBM, Shamus has no right to any affirmative relief against LBM.  The claims contained in the Counterclaim and referenced in the Objection are based on injuries alleged to have been suffered by parties other than Shamus.  Those injuries are not personal to Shamus and, therefore, Shamus has no standing to seek redress for them.

A.        The Doctrine of Standing.

"Standing is a 'threshold question in every federal case, determining the power of the court to entertain the suit'."  See In re Newcare Health Corp., 244 B.R. 167, 170 (B.A.P. 1st Cir. 2000) (quoting, Warth v. Seldin, 422 U.S. 490 (1975)).  If the plaintiff lacks standing to bring an action, the court lacks jurisdiction to hear it.  See id.  The plaintiff bears the burden of establishing its standing to prosecute an action and, in doing so, it must satisfy both the constitutional and prudential components of standing.  See id.; Massachusetts Independent Certification, Inc. v. Johanns, 486 F.Supp.2d 105, 114 (D. Mass 2007).  With respect to constitutional standing, the plaintiff  must demonstrate three elements: (1) the plaintiff has suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and

particularized and (b) actual or imminent; (2) a causal connection between the injury and the

conduct complained of; and (3) that it is likely that the injury will be redressed by a favorable

decision. See Massachusetts Independent Certification, 486 F.Supp.2d at 114.  With respect to

prudential standing, the plaintiff must establish that it is not raising rights held by another person.

See id.; In re Newcare Health Corp., 244 B.R. at 170; American Tissue Inc., v. Arthur Andersen,

L.L.P., 275 F.Supp.2d 398, 404 (S.D.N.Y. 2003); see also Shearson Lehman Hutton, Inc., v.

Wagoner, 944 F.2d 114, 118-20 (2d Cir. 1991).

Using the following language, the United States District Court for the District of

Massachusetts made clear that the injuries complained of must be personal to the plaintiff:

> To have standing, 'a plaintiff must allege **personal** injury fairly
> traceable to the defendant's allegedly unlawful conduct and likely
> to be redressed by the requested relief. . .The injury alleged must
> be, for example, distinct and palpable, and not abstract or
> conjectural or hypothetical. The injury must be fairly traceable to
> the challenged action, and relief from the injury must be likely to
> follow from a favorable decision…'Therefore, in order for the
> Trustee to have standing, he must allege injuries to L&H itself, and
> not injuries to third parties …

Baena v. KPMG LLP, 389 F. Supp.2d 112, 116 (Bankr. D.Mass. 2005) (emphasis added).  The

Venice-Oxford decision is similarly instructive.  236 B.R. at 816-20.  There, a Chapter 11 debtor

sued the holder of a mortgage on the debtor's property seeking to determine the extent and

validity of the mortgage, to equitably subordinate, disallow, or limit it, and related declaratory

relief.  The debtor alleged that the creditor acquired the property at an auction in which the

creditor acted improperly, seeking to gain an unfair advantage over the other auction bidders.

The debtor was not a bidder at the auction.  In dismissing the case for lack of standing, the court

found that the debtor was unable to identify any actual injury that it suffered as a result of the

defendant's conduct because its obligations under the note and mortgage were the same before

and after the auction.  Moreover, any wrongdoing at the auction did not injure the debtor because it was not a bidder.

The United States District Court for the Southern District of New York recently applied the same principles in a different context.  See Tasini, 184 F.Supp.2d 350-357.  A trial court in the State of New York had previously found that the New York Times violated certain copyright laws by placing print articles written by its freelance writers on its website without making payment to the writers.  Following that decision, the New York Times adopted a policy of offering writers the option of having their articles removed from the website or executing a release of any possible future copyright claim.  Thereafter, Tasini, a former freelance writer for the defendant, sued the New York Times  seeking a judgment declaring the release offered to the writers to be unlawful and unenforceable. The newspaper moved to dismiss based upon lack of standing because Tasini no longer had articles on the New York Times's website, he did not sign nor intend to sign the release himself, and he had no right to pursue the claim on behalf of any other writer.   The court granted that motion, stating that the plaintiff "has shown nothing outside the pleadings to suggest that he suffered personal injury, either actual or threatened. . ." 184 F.Supp.2d at 355.  Likewise, in this action since none of the alleged actions of LBM had any effect on Shamus, it does not have standing to bring its claims.

B.    Shamus Has No Standing to Pursue Counts II (Breach of Contract), III (Breach of Covenant of Good Faith and Fair Dealing), and VIII (Failure of Consideration) Because it Never Entered Into a Contract with LBM.

Claims for breach of contract, breach of the covenant of good faith and fair dealing, and failure of consideration presuppose the existence of an underlying contract between the parties. See Guckenberger v. Boston University, 957 F.Supp. 306, 316 (D. Mass.1997) (breach of contract claims require a plaintiff to prove: (1) the existence of a contract; (2) a breach on the

part of the defendant; and (3) damages to the plaintiff as a result of the breach); <u>Laser Labs, Inc.</u>

<u>v. ETL Testing Laboratories, Inc.</u>, 29 F. Supp.2d. 21, 24 (D. Mass. 1998) (an element of a claim

for breach of the implied covenant of good faith and fair dealing is the existence of an

enforceable contract between the plaintiff and the defendant); <u>Massachusetts Eye and Ear</u>

<u>Infirmary v. QLT Phototherapeutics, Inc.</u>, 412 F.3d 215, 230 (1st Cir. 2005) (without a contract,

there can be no covenant to breach); <u>Bateman v. Republic Finance Corporation</u>, 2006 WL

2425011 * 11 (Mass. Super) ("Consideration is one of the three elements needed to form a

binding contract. [It is] an element of a contract, is not a cause of action.").

No contract of any kind was ever entered into between LBM and Shamus.  As a result,

Shamus is left to seek redress for LBM's alleged breaches of contracts between LBM and Pine

Banks (Counts II and III) and between LBM and Foundry (Count VIII).   Although Shamus

suggests that it is the successor in interest to Pine Banks's rights to enforce a breach of the

covenant of good faith and fair dealing, it provides no factual basis (i.e., an assignment of

claims) or legal support for the bold proposition that an entity acquiring title to property from the

high bidder at foreclosure succeeds to all contractual rights that the foreclosing mortgagee may

have had against another mortgagee.  Because Shamus was not a party to the contracts invoked

in Counts II, III, and VIII of the Counterclaim, Shamus has no standing to enforce their breach.

    C.    <u>Shamus Has No Standing to Pursue Counts IV (Unjust Enrichment), VI
    (Equitable Subrogation), VII (Recharacterization), and X (Violations of G.L.
    93A) Because it Has Suffered No Injury Personal to Shamus</u>.

In Count IV, Shamus seeks to recover for LBM's unjust enrichment at the expense of

Pine Banks and Foundry.  Unjust enrichment requires both an enrichment of one party and an

impoverishment of the other.  <u>See</u> <u>In re Lupon Marketing and Sales Practices Litigation</u>, 295

F.Supp.2d 148, 182 (D. Mass. 2003).  Shamus fails to allege that it suffered any impoverishment

as a result of this alleged unjust enrichment and it fails to suggest that either Pine Bank or

Foundry are unable to avail themselves of claims against LBM.  As a consequence, Shamus

lacks standing to pursue this claim.

Similarly, in Count VI, Shamus seeks to avoid or subordinate the mortgage securing

LBM's claim under the doctrine of equitable subrogation.  As grounds for this relief, Shamus

asserts that it should benefit from Pine Banks's payment of the debt to FIG which resulted in the

discharge of FIG's mortgage against the Foundry Property and the improvement in LBM's

secured position on that property.  The claim of equitable subrogation, however, is personal to

the entity which made the payment that resulted in another party's improvement in position.  See

In re North American Rubber Thread Co., Inc., 333 B.R. 164, 168 (Bankr. D. Mass. 2005)

("where one party, by virtue of its payment of another's obligation, steps into the shoes of the

party who was owed the obligation for purposes of getting recompense for its payment.").

Shamus did not make any payment to FIG or any other party which improved LBM's position.

Thus, it experienced no injury and, as a consequence, has no standing to pursue the claim of

equitable subrogation.

Shamus, in Count VII of the Counterclaim, seeks to recharacterize LBM's claim against

655 Corp. as an equity interest.  A claim for recharacterization of debt to equity arises where a

creditor has made a contribution to a debtor that in substance is really an equity contribution.

See In re Atlantic Rancher, Inc., 279 B.R. 411, 432 (Bankr. D. Mass. 2002).  To the extent that

such relief would be appropriate, 655 Corp. would be the proper entity to seek such relief.

Shamus has neither alleged that LBM invested money in Shamus, nor has it alleged that LBM

should be treated as an owner of Shamus.  Accordingly, Shamus has no standing to

recharacterize the debt underlying LBM's secured claim against the Foundry Property.

Finally, in Count X of the Counterclaim, Shamus alleges that it has suffered damage as a result of the unfair and deceptive acts and practices of LBM.  Violations of Chapter 93A necessarily arise from the conduct of a trade or commerce between the parties.  See Weeks v. Harbor Nat'l. Bank, 388 Mass. 141, 144 (1983); Madan v. Royal Indemnity Co., 26 Mass. App. Ct. 756, 762-63 (1989).  Here, however, LBM and Shamus never had business dealings of any kind.  To the extent that LBM's actions may be characterized as unfair or deceptive, those actions were perpetrated against parties other than Shamus.  Where Shamus paid one dollar for the Foundry Property years after any of these alleged actions occurred, and where Shamus did not even exist at that time, Shamus cannot have standing to allege that is was damaged was a result of those actions.

D.    Shamus Has No Standing to Pursue Counts V (Fraud) and IX (Equitable Estoppel) Because LBM Has Made No Representations or Other Statements to Shamus.

Proving a claim of fraud requires a plaintiff to establish: (1) a false representation of a material fact; (2) the false representation was made with knowledge of its falsity; (3) the false representation was made for the purpose on inducing the other party to act thereon; and (4) that the plaintiff relied upon the representation as true and to its detriment.  See Equipment & Systems for Industry v. Northmeadows Construction Co., Inc., 59 Mass. App. Ct. 931, 798 N.E.2d 571, 574 (2003).  Similarly, equitable estoppel requires a plaintiff to prove  (1) a material misrepresentation of a party who had reason to know of its falsity, (2) reasonable reliance upon the misrepresentation, and (3) some disadvantage to the party seeking to assert estoppel fairly traceable to the isrepresentation.  See Harrington v. Fall River Housing Authority et al., 538 N.E.2d 24, 29, 27 Mass. App. Ct. 301, 307 (1989).

These two different claims share a common predicate: the plaintiff must prove that the defendant made representations to it upon which the plaintiff relied.  In Count V, Shamus alleges

that LBM made representations to Pine Banks and its counsel upon which Pine Banks relied.  In

Count IX, Shamus alleges that LBM made representations to Pine Banks and Foundry upon

which they relied.  None of the representations were made to Shamus and they all were made

years before Shamus was incorporated.  Any damages resulting from those representations

would have been suffered by Pine Banks or Foundry, not Shamus.  As a consequence, Shamus

does not have standing to pursue those claims.

> E.     The Objection and Count I of the Counterclaim Seeking a Declaratory Judgment
> Against LBM Fail to the Extent That They Are Grounded in the Causes of Action
> for Which Shamus Has No Standing.

Shamus cannot skirt the fundamental requirements of standing by pursuing relief in the

form of a declaratory judgment or an objection to LBM's claim.  Standing is a condition

precedent for obtaining declaratory relief as it is with any other claim.  See Tasini, 184

F.Supp.2d at 356.  Here, both the Objection and the declaratory relief sought under Count I rely

upon, and are derivative of, the claims outlined in the Counterclaim.  In reality, Count I and the

Objection are nothing more than substantially similar summaries of all the causes of action listed

under Counts II though X.  See Objection and Counterclaim, ¶¶ 2, 75.  Accordingly, to the extent

that the relief sought in the Objection and Count I of the Counterclaim is predicated upon the

existence of claims which are ultimately dismissed because of a lack of standing, the Objection

and Count I should be dismissed as well.

**II.     IF ANY CAUSES OF ACTION IN THE COUNTERCLAIM SURVIVE THE
STANDING ANALYSIS, THEY MUST BE DISMISSED FOR FAILING TO
STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED AS TO SHAMUS.**

"Like a battlefield surgeon sorting the hopeful from the hopeless, a motion to dismiss

invokes a form of legal triage, a paring of viable claims from those doomed by law."

Guckenberger v. Boston University, 957 F.Supp. 306, 313 (D. Mass 1997) (citing Iacampo v.

Hasbro Inc., 929 F.Supp. 562, 567 (D.R.I. 1996)). In evaluating a motion to dismiss, the United

States Supreme Court recently stated that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do… Factual allegations must be enough to raise a right to relief above the speculative level" [internal citations omitted]. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007); see also In re Vincent, 381 B.R. 564, 569 (Bankr. D. Mass 2008). Not one of the counts of the Counterclaim can survive even this initial scrutiny.

    A.    <u>The Breach of Contract Claim Fails Because There Was No Contract Between Shamus and LBM and Even if There Was it is Unenforceable</u>.

To state a claim for breach of contract, a plaintiff must allege at a minimum: (1) the existence of a contract; (2) a breach on the part of the defendant; and (3) damages to the plaintiff as a result of the breach. See Guckenberger v. Boston University, 957 F.Supp. 306, 316 (D. Mass.1997). It also follows that privity of contact must exist between the plaintiff and defendant. Carter v. Yardley & CO., 64 N.E.2d 693, 696, n. 2 (Mass. 1946). In Count II of the Counterclaim, the Debtor asserts a breach of contract claim but does not allege that it was party to that contract or to any agreement with LBM. Nor does it allege it was the assignee of such a contract or the intended third-party beneficiary of such a contract. To the contrary; Shamus only alleges that LBM and **Pine Banks** entered into an agreement whereby LBM would subordinate its mortgage to Pine Banks. There was no contract between LBM and Shamus and, therefore, no obligation from LBM to Shamus which LBM could have breached.

Moreover, the subordination agreement cannot be enforced because it was never reduced to writing. The Statute of Frauds provides that "no action shall be brought . . . upon a contract for the sale of lands . . . **or of any interest in or concerning them** . . ." unless the contract is in

-14-

writing.  M.G.L. c. 259, § 1 (the "Statute of Fraud") (emphasis added).   A subordination

agreement is subject to the Statute of Frauds and must be in writing to be enforceable.  See

RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.7 (1997) ("the Statute of Frauds is usually

held applicable to subordinations") (and cases cited).  To be enforceable, a subordination

agreement must be in writing because it "assigns" a lower priority to a mortgage, which affects

an interest in or concerns land.  See e.g. Linsky v. Exchange Trust Co., 260 Mass. 15, 18 (1927)

("agreement to give or assign a mortgage is an agreement to convey an interest in land and, to be

enforceable, must be in writing."); Metropolitan Credit Union v. Matthes, 46 Mass. App. Ct. 326,

334 (1999) (release or partial release of mortgage must be in writing to be enforceable).[2]

LBM's alleged agreement to subordinate the LBM Mortgage was not reduced to writing.

Indeed, the principal basis for the contract claim is LBM's refusal to execute a subordination

agreement or any other writing.  In the absence of a writing, the Statute of Frauds is not satisfied

and an alleged oral agreement to subordinate is not enforceable.  Id.  Accordingly, the claim for

breach of contract is barred by the Statute of Frauds and must be dismissed.

B.      The Absence of a Contract Between Shamus and LBM is Fatal to Shamus's
          Claim for Breach of the Covenant of Good Faith and Fair Dealing.

In Massachusetts every contract implies good faith and fair dealing by the parties in its

performance.  Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 473 (1991); Cadle

Co. v. Vargas, 55 Mass. App. Ct. 361, 366 (2002).  In order to prove a breach of the implied

covenant of good faith and fair dealing, however, a plaintiff must first establish that an

enforceable contract existed between the parties.  See Laser Labs, Inc. v. ETL Testing

Laboratories, Inc., 29 F. Supp. 2d. 21, 24 (D. Mass. 1998); Christensen v. Kingston School

---

[2] For similar reasons, the alleged agreement to release the LBM Mortgage upon the meeting of
certain construction benchmarks cannot be enforced.  See Objection and Counterclaim, ¶ 38.

Committee, 360 F. Supp. 2d. 212, 226 (D. Mass. 2005). Without a contract, there can be no

implied covenant to breach. Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics,

Inc., 412 F.3d 215, 230 (1st Cir. 2005).  As discussed in section II(A) above, the Counterclaim

fails to allege that LBM was a party to any contract with Shamus.  Rather, it is clear from the

allegations in the Counterclaim that the only parties LBM had agreements with were 655,

Foundry, and Pine Banks. Thus, the lack of a contract precludes Shamus from asserting a claim

for breach of covenant of good faith and fair dealing.  See Laser Labs, Inc. v. ETL Testing

Laboratories, Inc., 29 F. Supp. 2d. at 24; Christensen v. Kingston School Committee, 360 F.

Supp. 2d. at 226.

        C.        The Claim for Unjust Enrichment Fails Because Shamus Has Suffered No Harm
                       as a Result of Any Action Taken by LBM and, Even if it Had, Shamus Has an
                       Adequate Remedy at Law.

In Count IV, Shamus alleges that LBM has been unjustly enriched because of its failure

to subordinate its mortgage to Pine Banks.  See Objection and Counterclaim ¶¶ 85-88.  A claim

for unjust enrichment requires: (1) an enrichment of one party; (2) an impoverishment of the

other; (3) a relationship between the enrichment and the impoverishment; (4) an absence of

justification; and (5) the absence of an adequate remedy at law. See In re Lupon Marketing and

Sales Practices Litigation, 295 F.Supp.2d 148, 182 (D. Mass. 2003).  To succeed on this claim,

Shamus must show that LBM received a direct benefit at the Debtor's expense, and that LBM

has "been enriched and unjustly so, such as when" it "receives requested goods or services

without paying any compensation therefore." Taylor Woodrow Blitman Construction

Corporation, v. Southfield Gardens Company et al., 534 F.Supp 340, 347 (D. Mass. 1982).

This count fails because Shamus incurred no expense or impoverishment as a result of the

actions or omissions of LBM.  Indeed, there is no allegation in the Objection and Counterclaim

to suggest that Shamus ever incurred an expense during the six days it existed prior to filing for

bankruptcy relief.  If LBM benefited at the direct expense of another party by refusing to subordinate the Mortgage, it was Pine Banks, not Shamus.

This count also fails because the Objection provides Shamus with an adequate remedy at law.  If LBM's claim must be reduced because of a failure to lend, or to apply payments, or for some similar reason that might otherwise warrant a reduction in the amount of that claim, then the Objection provides Shamus with the adequate remedy at law to pursue such relief.  The presence of that remedy undermines the viability of the claim for unjust enrichment which must, therefore, be dismissed.

     D.     <u>The Fraud Claim Fails Because Shamus Could Not Have Reasonably Relied on Representations Made to Another Party at a Time When Shamus Did Not Exist and the Alleged Fraud is Not Described With Reasonable Particularity</u>.

The elements of a cause of action for fraud include: (1) a false representation of a material fact; (2) the false representation was made with knowledge of its falsity; (3) the false representation was made for the purpose on inducing the other party to act thereon; and (4) the plaintiff relied upon the representation as true and to its detriment.  <u>Equipment & Systems for Industry v. Northmeadows Construction Co., Inc</u>., 59 Mass. App. Ct. 931, 798 N.E.2d 571, 574 (2003).  Although Shamus alleges that Pine Banks reasonably relied upon LBM's alleged misrepresentations, it fails to assert that Shamus relied upon those representations.  Indeed, there is no plausible way that Shamus could make such an allegation because it was not incorporated until several years after the representations were made and the LBM Mortgage was clearly of record as an encumbrance of the Foundry Property at the time that Shamus acquired that asset.

Even if Shamus had plead all of the elements of a fraud claim, the allegations on which it relied did not meet with the particularity demanded by the relevant rules of procedure.  <u>See</u> Fed.R.Civ.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"); Mass.R. Civ. P. 9(b) ("in all averments of fraud . .

the circumstances constituting fraud. . .shall be stated with particularity.").  Contrary to the

liberal pleading standards set forth in Fed.R.Civ.P. 8, a complaint alleging fraud must allege the

"what, when, where, and how" of the fraud or misrepresentation or the "first paragraph of any

newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990).  Stated another

way, to comply with Rule 9(b) the complaint must allege the "time, place, and content" of the

alleged false statement. Tingley Systems, Inc., v. CSC Consulting, Inc., 152 F.Supp.2d 95, 117

(D. Mass. 2001).

  The Counterclaim is devoid of any allegations that would satisfy the particularity

requirements of Rule 9(b).  The only allegation on point is the general averment that "In

connection with the Pine Banks loan, Mallegni and Norris represented to Ross [as counsel to

Pine Banks], Laverty and Sojcher that LBM would subordinate the LBM Mortgage to the

proposed mortgage loan from Pine Banks."  Objection and Counterclaim, ¶ 42.  Although

paragraph 90 of the Counterclaim asserts that "LBM repeatedly represented to Ross and Pine

Banks that it would subordinate the LBM Mortgage to the Pine Banks Mortgage," nowhere in

the Objection and Counterclaim is there a description of the date, place, or actual words used in

connection with the alleged misrepresentations.  The Counterclaim simply fails to state when

LBM made the representation that it would subordinate its Mortgage, who on behalf of LBM

made the representation, how the representation was made, the content and context of the

representation, or where the representation was made.  Without more detail, LBM cannot

properly defend against the fraud advanced by Shamus and the claim fails to meet the

requirements of Rule 9(b).

E.      The Equitable Estoppel Claim Fails Because Shamus Cannot Trace Any Harm to
        Itself From Representations Made By LBM to Pine Banks.

Equitable estoppel is a doctrine intended to prevent "one from benefiting from his own

wrong doing and avoid injustice." Harrington, 27 Mass. App. Ct. at 307 (1989).  "A party relying

on an estoppel theory has a heavy burden to prove that all the elements are present." Id.  At the

time Shamus came into existence, the LBM Mortgage was recorded against the Foundry

Property as the first mortgage and all representations made by LBM were years old.  The

decision by Shamus to acquire the Foundry Property for one dollar under these circumstances is

not explained in the Objection and Counterclaim.  But it need not be in order to safely conclude

that any harm it suffered as a result of acquiring the Foundry Property could not fairly be traced

to the representations alleged to have been made by LBM to Pine Banks, 655 Corp. and Foundry.

As a consequence, Shamus simply cannot satisfy the elements of an equitable estoppel claim.

F.      The Claim for Recharacterization Fails Because of LBM Made No Contribution
        of Any Kind to Shamus.

A claim for recharacterization of debt to equity arises where a creditor has made a

contribution to a debtor that in substance is really an equity contribution. In re Atlantic Rancher,

Inc., 279 B.R. 411, 432 (Bankr. D. Mass. 2002).  In analyzing whether the nature of the

transaction was an equity contribution or a loan, courts consider several factors more suited to

situations in which the character of a shareholder's investment in a company is being analyzed.

See id. at 433-34.  Where the dispute between Shamus and LBM arises in a completely different

context, the factors ordinarily considered in connection with a claim for recharacterization (e.g.,

the degree of shareholder control, the amount of capital needed and contributed, the causes of the

company's failure, the use of the capital contributed by the shareholder, and the documentation

of the debt) are simply inapplicable.  Id.   LBM is not a shareholder of Shamus and it invested no

funds in that entity.  Its only connection to Shamus is that it holds a secured claim against the

Foundry Property.  In this context, the claim to recharacterize LBM's claim as equity in Shamus

simply makes no sense.

      G.    <u>The Claim for Failure of Consideration Must Be Dismissed</u>.

      Although often pursued as a defense to a contract enforcement action, the claim of failure

of consideration has no independent viability.  <u>See</u>  <u>Bateman v. Republic Finance Corporation</u>,

2006 WL 2425011 * 11 (Mass. Super) ("[T]his court questions whether there is any such thing

as a claim for 'failure of consideration.' Consideration is one of the three elements needed to

form a binding contract. An element of a contract is not a cause of action.").  To the extent that

affirmative relief in this context is warranted (as opposed to an offset or reduction of the amount

of LBM's claim), then a fraudulent transfer action might be more applicable.  Of course, Shamus

could not bring such an action because none of its property was transferred.  Moreover, any such

action would be time barred because the granting of the LBM Mortgage took place more than

four years before the Shamus bankruptcy proceeding.

      In any event, the absence of a contract between Shamus and LBM undermines the

efficacy of the claim as plead by Shamus.  Moreover, each of the LBM/655 Note, LBM

Mortgage and Foundry Guaranty was executed under seal.  Where a contract is signed under

seal, there is a legal presumption of consideration.  <u>See</u> <u>Holt v. F.D.I.C.</u>, 216 B.R. 71, 76 (Bankr.

D. Mass 1997); <u>Thomas v. Kiendzior</u>, 27 Mass. App. Ct. 370, 374 (1989).  Accordingly, Count

VIII must be dismissed for failure to state a claim.

      H.    <u>The Claim for Equitable Subordination Fails Because Shamus Did Not Pay the
FIG Mortgage</u>.

      Equitable subrogation is a concept that arises "where one party, by virtue of its payment

of another's obligation, steps into the shoes of the party who was owed the obligation for

purposes of getting recompense for its payment." <u>In re North American Rubber Thread Co., Inc.</u>,

333 B.R. 164, 168 (Bankr. D. Mass. 2005).   In order for equitable subrogation to apply here,

Shamus was required to allege that *it* advanced the funds which resulted in the payment of the

mortgage held by FIG mortgage.   Then it could have argued that, unless LBM is subordinated to

the claim of Shamus, then LBM would receive a windfall in the form of an un-bargained for

improvement in position at Shamus's expense.   The equitable subrogation claim fails here,

however, because Shamus did not advance those funds – Pine Banks did.   Accordingly, the

equitable subrogation claim must be dismissed.

> I.   The Claim For Violations of Chapter 93A Must Be Dismissed Because Shamus Suffered No Damage as a Result of LBM's Alleged Actions.

In order to succeed on a Chapter 93A claim, the Debtor must establish that LBM

committed an "unfair or deceptive act or practice" in the conduct of trade or commerce resulting

in damage to Shamus.   See Weeks v. Harbor Nat'l. Bank, 388 Mass. 141, 144 (1983); Madan v.

Royal Indemnity Co., 26 Mass. App. Ct. 756, 762-63 (1989).   There is no authority for the

proposition that LBM should be exposed to a claim for deceptive acts or practices from an entity

which neither existed at the time of the alleged actions nor ever conducted business with LBM.

Moreover, Shamus has not alleged, and certainly could not prove, that its decision to acquire the

Foundry Property for one dollar, or its decision to incur the one unsecured debt listed on its

schedules, were prompted by any action of LBM – unfair, deceptive or otherwise.   LBM had no

contact with Shamus and caused it no harm.   The claim for damages under Chapter 93A,

therefore, must simply be dismissed.

## CONCLUSION

Shamus has no standing to prosecute the causes of action listed in the Counterclaim and,

therefore, they must be dismissed.   Moreover, each of these claims fail to request relief that may

-21-

be granted and, as such, must be dismissed.  To the extent that the Objection relies upon the

existence of these claims, it must also be dismissed.

Respectfully submitted,

LBM FINANCIAL, LLC,

Dated: March 21, 2008

/s/  Jeffrey D. Ganz
Jeffrey D. Ganz (BBO #564375)
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000

1063144.3