# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**SHAMUS HOLDINGS, LLC,**                           Chapter 11
    Debtor                      Case No. 07-14572-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~

**SHAMUS HOLDINGS, LLC,**
    Plaintiff
v.                                                  Adv. P. No. 08-1030
**LBM FINANCIAL, LLC,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

## I. INTRODUCTION

The matter before the court is the Motion of LBM Financial, LLC ("LBM") to Dismiss the "Objection to Claim and Counterclaim" filed by Shamus Holdings, LLC (the "Debtor"). The Debtor filed an Opposition to LBM's Motion to Dismiss, and the Court heard the matter on June 3, 2008. The issues presented by LBM's Motion and the Debtor's Opposition include whether the Debtor lacks standing, either constitutional or prudential,

1

to assert its ten-count Counterclaim and its Objection to LBM's proof of claim to the extent

the Objection is predicated upon the content of its counterclaims, and whether the Debtor

has stated counterclaims upon which relief can be granted. For the reasons set forth below,

the Court shall enter an order granting in part and denying in part LBM's Motion to

Dismiss.

## II. THE DEBTOR

The Debtor filed a voluntary Chapter 11 petition on July 25, 2007 to forestall a

foreclosure sale scheduled for that day by LBM. The Debtor was organized as a

Massachusetts limited liability company on July 19, 2007. On that same day, Steven A.

Ross ("Ross"), Trustee of 14 Beach Street Realty Trust (the "Beach Street Realty Trust"), for

nominal consideration of $1, conveyed the premises known and numbered as Unit C-1 of

the Foundry Condominium, located at 314-330 West Second Street, South Boston (the

"Foundry property"), to the Debtor.

The Debtor's petition was signed by Ross as its manager.[1] On August 9, 2007, the

Debtor filed its Schedules and Statement of Financial Affairs. It listed four assets: the

Foundry property, personal property comprised of $1,000 in a bank account, a contingent

claim against Pine Banks Nominee Trust with an unknown value, and an equitable

---

[1] *See* Fed. R. Evid. 201; In re Colonial Mtg. Bankers Corp., 324 F.3d 12 (1st Cir. 2003) (in deciding a motion to dismiss, a court may look "not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice. The first part of this rule is consistent with the axiom that a writing is the best evidence of its contents. The second part of this rule is consistent with the hoary tenet that a court 'may look to matters of public record in deciding a Rule 12(b)(6) motion.'"). Id. at 15-16 (citations omitted).

subrogation claim against LBM with a value of $550,000. The Debtor also listed as assets two leases of space at the Foundry property which it maintains generate approximately $5,500 per month according to its Statement of Financial Affairs. The Debtor listed one secured creditor, LBM, and one unsecured creditor, GMCR Capital LLC with a claim in the sum of $480,000 arising from a loan made on July 3, 2007.

On August 17, 2007, LBM moved to dismiss the Debtor's Chapter 11 case. It attached to its motion the Debtor's Certificate of Organization and the Unit Deed, dated July 17, 2007 and recorded on July 19, 2007, pursuant to which Ross, as Trustee of the 14 Beach Street Realty Trust, conveyed the Foundry property to the Debtor, as well as a Foreclosure Deed, recorded approximately two years earlier on September 14, 2005, pursuant to which Charles J. Housman ("Housman"), Trustee of Pine Banks Nominee Trust ("Pine Banks"), the holder of a mortgage from Foundry Realty, LLC ("Foundry Realty"), a Massachusetts limited liability company, conveyed the Foundry property to Ross, as Trustee of the Beach Street Realty Trust, for a stated consideration of $760,000. Additionally, LBM attached copies of a Mortgage and Security Agreement, dated May 9, 2003 and executed under seal, pursuant to which Foundry Realty, by its manager, Stuart H. Sojcher ("Sojcher"), secured its guaranty of a $1,200,000 loan, evidenced by a Note, dated May 9, 2003, executed by LBM and 655 Corporation, an affiliate of Foundry Realty.[2]

---

[2] The Note was secured by mortgages on property owned by 655 Corporation, namely 653-659 East Second Street, South Boston, MA, and property owned by Foundry Realty. It was also secured by mortgages on property located at 130 Pokanoket Lane, Marshfield, MA, 1736 Liberty Street, Braintree, MA, 244 Main Street, Worcester, MA, and 420 West Broadway/353-361 Athens Street, South Boston, MA.

The Guaranty provided that it was "intended to take effect as a sealed instrument" and that it would "be binding upon the Guarantor and his [sic] heirs, executors, administrators, and assigns. . . ." The Note, the repayment of which Foundry Realty guaranteed, provided for interest at the rate of 16% per annum, contained a maturity date of September 9, 2003, and was executed by Barry L. Queen ("Queen"), the President and Treasurer of 655 Corp.

## III. LBM'S PROOF OF CLAIM

LBM filed a proof of claim in the Debtor's bankruptcy case in which it asserted that it was owed $4,154,610.92 calculated as follows:

1. Amount due under a Note dated May 9, 2003 executed by 655 Corp. and secured by a Mortgage and Security Agreement recorded against property standing in the name of Shamus Holdings, LLC:

| | |
|---|---|
| Original principal amount | $1,200,000.00 |
| Additional principal outstanding on July 25, 2007 | $2,926,310.57 |
| Total Amount Outstanding | $4,126,310.57 |
| 2. Attorneys' Fees and Expenses through July 25, 2007 | $28,300.35 |
| 3. **TOTAL CLAIM AMOUNT** | $4,154,610.92 |

## II. THE DEBTOR'S OBJECTION TO CLAIM AND COUNTERCLAIM

On February 11, 2008, the Debtor commenced an adversary proceeding against LBM, which it described as a "notorious 'hard money' lender," captioned "Objection to Claim and Counterclaim." This Court's assessment of LBM's Motion to Dismiss the Debtor's Objection to Claim and Counterclaim depends upon an understanding of the relationship between Foundry Realty and 655 Corp., as well as various loans made to those entities by LBM, and representations, written and otherwise, made in conjunction with

4

those loans. The facts alleged in its Objection to Claim and Counterclaim are summarized as follows.

655 Corp is a real estate development company and a debtor before this Court (Case No. 06-13020). Mark G. DeGiacomo is the duly appointed and acting Chapter 11 trustee of 655 Corp., whose sole asset is an 18-unit condominium development located at 653-659 East Second Street (the "East Second Street property") in South Boston.

The Debtor alleged that, prior to 2002, 655 Corp. was owned and controlled by Francis Fraine ("Fraine"), Frank D. Kirby ("Kirby"), and Robert Bradley ("Bradley"). According to the Debtor, Bradley proposed creation of a joint venture to Marcello Mallegni ("Mallegni"), who is LBM's principal, for the purpose of acquiring and developing the East Second Street property. In furtherance of the joint venture, on March 13, 2002, Mallegni, William DiPietri ("DiPietri"), who with Mallegni is a member of an entity know as Wolfpen Financial, LLC, as well as Kirby, Bradley, and Fraine, executed an "Inducement and Shareholders' Agreement" and a separate Stock Transfer Agreement pursuant to which Bradley, Fraine, and Kirby transferred twenty-five percent of the outstanding stock in 655 Corp. to Mallegni and Dipietri (12.5% each). Pursuant to the Inducement and Shareholders' Agreement, Mallegni and Dipietri were entitled to "receive . . . distributive funds or profits" and were entitled to "review and approve all contracts, loan agreements, and each and every other cost, fee, or expense associated with the development of the [East Second Street] property." On the same day, March 13, 2002, all of 655 Corp.'s shareholders executed the "655 Corp. Voting Trust" pursuant to which all of the existing shares of stock

5

were transferred to Mallegni, as trustee. Mallegni was then entitled to the "full and unqualified right and power to vote . . . all or any of the Trust Stock. . ." until the trust terminated. Simultaneously, with the execution of the various documents just described, Wolfpen, whose only members were Mallegni and Dipietri, loaned 655 Corp. $2,275,000 pursuant to a written promissory note. The loan was payable in six months and was guaranteed by Fraine, Bradley and Kirby, as well as On Broadway Corp., who secured its guaranty with a mortgage on property located at 420 West Broadway, South Boston.

The Debtor alleged that in the fall of 2002, 655 Corp. approached General Bank, now known as Cathay Bank,  seeking a $5.6 million construction loan for the East Second Street property. General Bank, through its Senior Vice-President, Linda Moulton, recommended approval of the loan on condition that 655 Corp. invest $1.2 million in equity in the corporation. Although General Bank was to have provided 655 Corp. with $5.6 million in construction funds, according to the Debtor, it only could accommodate $1,598,000 with which 655 Corp. could repay the Wolfpen loan. The Debtor further alleged that DiPietri was demanding that his portion of the Wolfpen note from 655 Corp. be repaid, that Mallegni agreed that funds from the General Bank loan would be used to repay DiPietri, and that $1.2 million of Mallegni's interest in the Wolfpen loan would remain as equity in the East Second Street property. Additionally, the Debtor alleged that neither Mallegni nor Fraine wished to be identified as owners of 655 Corp. As a result, Queen and Bernard Laverty ("Laverty") were made nominal owners and officers of 655 Corp.

The Debtor alleged that on May 9, 2003, prior to the closing of the loan from General

6

Bank, which occurred on May 14, 2003, Mallegni and 655 Corp. "documented a sham loan transaction" which gave the appearance of a $1.2 million capital infusion in 655 Corp. and the East Second Street property.  655 Corp. executed a promissory note to LBM in the original principal amount of $1.2 million, together with a mortgage on the East Second Street property.  The note contained a September 9, 2003 maturity date, which was extended until April 9, 2004.  On the same day, Foundry Realty executed its guaranty of 655 Corp.'s note which it secured with a mortgage on the Foundry property - - the mortgage which the Debtor now challenges.

At the time Foundry Realty executed the May 9, 2003 guaranty and mortgage, the Foundry property was subject to a mortgage in the amount of $540,000 which it had executed in favor of Faneuil Investors Group Limited Partnership ("FIG"), the entity from whom it acquired the Foundry property for the purchase price of $600,000.

According to the Debtor, LBM agreed to discharge its mortgage on the East Second Street property upon completion of the lobby and installation of the elevator.  The Debtor alleged that Foundry Realty received no consideration in exchange for either the guaranty or mortgage.

Two days after the closing of the LBM loan, Queen, by letter dated May 11, 2003, advised General Bank that 655 Corp. had paid $1.2 million to Wolfpen in partial retirement of the Wolfpen loan.  He added: "It is my understanding with WolfPen [sic] that upon your financial institution tendering ONE MILLION FIVE HUNDRED NINETY EIGHT THOUSAND FIVE HUNDRED ($1,598,500.00) DOLLARS to WolfPen [sic] a full discharge of their mortgage

will be recorded." According to the Debtor, on May 12, 2003, LBM purported to fund the alleged loan by delivering a check in the sum of $1.2 million to Michael J. Norris ("Norris"), its corporate attorney and the closing attorney for the LBM/655 Corp. loan, which he deposited in his IOLTA account. The same day, Norris issued a check in the sum of $2,815,000.00 to Wolfpen to payoff 655 Corp.'s loan. The Debtor states that "[u]pon information and belief, that check was not delivered until after the General Bank Loan was funded on May 14, 2003."

On May 13, 2003, Wolfpen issued a check in the amount of $1,391,100.39 to LBM and a second check in the same amount to an affiliate of DiPietri, Rosewood Development. The Debtor states: "[u]pon information and belief, that check was not delivered until after the General Bank Loan was funded on May 14, 2003."

On May 14, 2003, 655 Corp. and General Bank closed the $5.6 million construction loan. According to the Debtor, from the loan proceeds, $1,598,000 was wired by General Bank to Norris who then delivered a check in the sum of $2,815,000 to Wolfpen. Wolfpen's $1,391,100.39 check to LBM cleared LBM's account on May 16, 2003, resulting in its receipt of more than 115% of its alleged $1.2 million "loan" to 655 Corp. within four calendar days after it allegedly funded it. On May 14, 2003, LBM recorded a mortgage against the East Second Street property and seven subsequent mortgages, despite provisions of the construction loan agreement between 655 Corp. and General Bank which required prior written consent of General Bank. Additionally, General Bank secured its loan, which was to come due on May 14, 2005, with a first mortgage on the East Second Street property and

8

a second mortgage against the Foundry property that was subordinated to the FIG mortgage.

The Debtor further alleged that General Bank, like LBM, agreed to discharge its mortgage against the Foundry property and other collateral upon completion of the lobby and elevator at the East Second Street property. The lobby and elevator were completed in 2006 and General Bank released its mortgage on the Foundry property; LBM did not.

According to the Debtor, Mallegni remains the controlling shareholder of 655 Corp. and LBM installed Vincent "J." DiMento [sic], a business partner of Mallegni, to oversee the completion of the East Second Street property.

As noted above, FIG sold the Foundry property to Foundry Realty in May of 2002 and Foundry Realty secured a portion of the purchase price with a first mortgage to FIG. When FIG's mortgage matured, it threatened to foreclose. In November of 2003, Housman, Trustee of Pine Banks, agreed to refinance the FIG note and mortgage. Notably, Pine Banks was represented at all times by Ross, who is a licensed attorney, as well as the Debtor's principal. According to the Debtor, in connection with the Pine Banks loan, Mallegni and Norris represented to Ross, Laverty and Sojcher that LBM would subordinate the LBM mortgage to the proposed mortgage from Pine Banks. General Bank also agreed to subordinate its mortgage on the Foundry property. The Debtor averred that in reliance upon the agreements of LBM and General Bank to subordinate their respective mortgages against the Foundry property, Pine Banks, on November 12, 2003, loaned Foundry Realty $760,000, and Foundry Realty granted Pine Banks a mortgage that "Ross and Pine Banks

9

believed would be a first priority lien against the property." The loan proceeds satisfied the FIG note and mortgage, and FIG discharged its mortgage. Two days after the execution of the Pine Banks note and mortgage, General Bank executed a written subordination agreement. According to the Debtor, "Pine Banks and Ross relied upon Sojcher to memorialize the subordination with both General Bank and LBM." LBM did not, and later refused to, deliver a written subordination agreement in favor of Pine Banks.

The LBM note executed by 655 Corp. and guaranteed by Foundry Realty matured on April 9, 2004. While that note was in default, LBM made six subsequent loans to 655 Corp. and no less than ten loans to various 655 Corp. affiliates.

In early 2005, Foundry Realty defaulted on its loan obligations to Pine Banks. On July 7, 2005, Pine Banks foreclosed its mortgage and was the highest bidder at the foreclosure auction. As noted above, following the foreclosure sale, Pine Banks conveyed the Foundry property to Ross, as Trustee of 14 Beach Street Realty Trust, which, in turn, conveyed the Foundry property to the Debtor on July 19, 2007, approximately one week before LBM's scheduled foreclosure sale.

## IV. DISCUSSION

### A. The Debtor's Claims

Based upon the foregoing allegations, the Debtor formulated ten counts as part of its Counterclaim as follows: Count I (Declaratory Judgment); Count II (Breach of Contract); Count III (Breach of Covenant of Good Faith and Fair Dealing); Count IV (Unjust Enrichment); Count V (Fraud); Count VI (Equitable Subrogation); Count VII

(Recharacterization); Count VIII (Failure of Consideration); Count IX (Equitable Estoppel); and Count X (Violation of c.93A - Unfair and Deceptive Acts and Practices). The Court shall address the claims substantially in the order set forth above, except that the Court shall consider the Debtor's Declaratory Judgment Count last. Moreover, the Court shall focus primarily on LBM's arguments that the Debtor has failed to state causes of action upon which relief can be granted, although where appropriate the Court shall consider the issue of the Debtor's standing to seek the relief it has set forth in its Objection to Claim and Counterclaim

B. Standards for Dismissal under Rule 12(b)(6)

As the United States Court of Appeals for the First Circuit observed in Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, (1st Cir. 2007),

> [T]he Supreme Court has recently held that to survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, --- U.S. ----, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007). In so doing, the Court disavowed the oft-quoted language of Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See Twombly, 127 S.Ct. at 1969. The Court found that the "no set of facts" language, if taken literally, would impermissibly allow for the pleading of "a wholly conclusory statement of [a] claim," and that "after puzzling the profession for 50 years, this famous observation has earned its retirement." Id. at 1968, 1969.

490 F.3d at 95-96. Thus, in reviewing each and every count of the Debtor's Objection to Claim and Counterclaim, this Court must determine whether the Debtor has set forth a plausible entitlement to relief.

C. Dismissal for Lack of Standing

11

_____The United States Bankruptcy Appellate Panel for the First Circuit in In re Newcare

Health Corp., 244 B.R. 167 (B.A.P. 1st Cir. 2000), examined the concept of standing in

connection with a request for an accounting and turnover by a party that asserted a

security interest in property belonging, not to the debtor, but to an affiliate of the debtor.

It observed the following:

> Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Hence, "a defect in standing cannot be waived; it must be raised, either by the parties or by the court, whenever it becomes apparent." U.S. v. AVX Corp., 962 F.2d 108, 116 n. 7 (1st Cir.1992).
>
> The inquiry into standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth, 422 U.S. at 498, 95 S.Ct. 2197. "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." Id. Apart from this minimum constitutional mandate, the Supreme Court recognizes other limits ". . . on the class of persons who may invoke the courts' decisional remedial powers." Id. at 499, 95 S.Ct. 2197. These prudential limitations are self-imposed rules of judicial restraint:
>
>> These considerations, which militate against standing, principally concern whether the litigant (1) asserts the rights and interests of a third party and not his or her own, (2) presents a claim arguably falling outside the zone of interests protected by the specific law invoked, or (3) advances abstract questions of wide public significance essentially amounting to generalized grievances more appropriately addressed to the representative branches.

244 B.R. at 170. In Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), the Supreme Court

stated that constitutional standing requires proof of three elements:

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a *causal*

12

*connection between the injury and the conduct complained of-the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560-61 (quotations and internal citations omitted)(emphasis added); *see*

*also* Massachusetts Independent Certification, Inc. v. Johanns, 486 F.Supp.2d 105, 114 (D.

Mass. 2007).

LBM argues that the Debtor has no standing to pursue counts II (Breach of

Contract), III (Breach of Covenant of Good Faith and Fair Dealing), and VIII (Failure of

Consideration) because it never entered into a contract with LBM. It also argues that the

Debtor has no standing to pursue counts IV (Unjust Enrichment), VI (Equitable

Subrogation), VII (Recharacterization) and X (c. 93A) because it suffered no injury personal

to it. Finally, it argues that the Debtor has no standing to pursue Counts V (Fraud) and IX

(Equitable Estoppel) because LBM made no representations to it.

The Debtor, in contrast, maintains it has standing to object to LBM's proof of claim

under section 502 of the Bankruptcy Code which provides in relevant part that

> (b) . . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that – (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. . . ."

11 U.S.C. § 502(b)(1). It asserts that by filing a proof of claim, it opened the door for it to

challenge the validity and enforceability of 655 Corp.'s obligation to LBM and the mortgage

13

Foundry Realty granted LBM to secure its guaranty.

D. Counts II, III, and IX

Through Count II, the Debtor complains that LBM refused to honor its agreement to subordinate its mortgage to the Pine Banks mortgage, thereby causing it harm. Through Count III, the Debtor maintains that the contractual relationship between Pine Banks and LBM carried with it an implied covenant of good faith and fair dealing and that LBM breached that covenant, presumably by failing to honor the subordination agreement. Finally, through Count IX, the Debtor seeks to equitably estop LBM from asserting a mortgage as a basis for its claim.

The Court finds that the Debtor has failed to satisfy the Twombly standard with respect to Counts II and III. As LBM recognizes, to state a claim for breach of contract, the "plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." Moghaddam v. Dunkin' Donuts, Inc., 295 F.Supp.2d 136, 139 (D. Mass. 2003)(quoting Guckenberger v. Boston Univ., 957 F.Supp. 306, 316-17 (D. Mass. 1997)). Moreover, Massachusetts law implies a duty of good faith and fair dealing in every contract. Moghaddam, 295 F.Supp.2d at 139 (citing James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1249 (1st Cir. 1997)). Under the implied covenant of good faith and fair dealing, neither party to the contract can do anything that "'will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Id. (quoting Anthony's Pier Four v. HBC Assoc., 411 Mass. 451, 471 (1991)).

14

The Debtor did not allege and cannot allege that it had a contractual relationship with LBM pertaining to the subordination of the mortgage securing Foundry Realty's guaranty of 655 Corp.'s note to LBM to the Pine Banks mortgage. The Debtor did not exist in November 2003 when, in connection with the Pine Banks loan, Mallegni and Norris allegedly represented to Pine Banks's counsel, Ross, that it would subordinate the LBM mortgage to the proposed mortgage loan from Pine Banks. Indeed, the Debtor was not formed until July 19, 2007. The Debtor listed a contingent claim against Pine Banks in its schedules; it did not list as an asset on Schedule B an assignment of any claims against LBM from Foundry Realty, Pine Banks, or Ross, as Trustee of 14 Beach Street Realty Trust. Furthermore, in its Objection to Claim and Counterclaim, the Debtor did not allege that Pine Banks assigned any potential claim it had against LBM either to Ross, as Trustee of 14 Beach Street Realty Trust, or to the Debtor. Finally, it did not, indeed could not, allege that it is a third party beneficiary of the contract between LBM and Pine Banks because it did not exist as a corporate entity at the time of the Pine Banks loan.

In addition to the above deficiencies with respect to Counts II and III, LBM correctly observes that the counts fail _Twombly_'s "plausible entitlement to relief" standard because the alleged subordination agreement between LBM and Pine Banks was not reduced to a writing. Under Massachusetts law,

> No action shall be brought: . . . [u]pon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.

15

Mass. Gen. Laws ch. 259, § 1. The Debtor does not allege that a written agreement existed; indeed, it stated that LBM refused to execute a written subordination agreement. Accordingly, its claim for breach of contract must fail, and, in the absence of an enforceable contract between the LBM and the Debtor, its claim for breach of any implied covenant of good faith and fair dealing must fail as well.

The Debtor relies upon an equitable estoppel theory in an attempt to overcome the Statute of Frauds. It recites that Pine Banks secured its loan with a mortgage against the Foundry property based on the express representation by LBM that it would discharge its mortgage upon the achievement of certain construction milestones at the East Second Street property and that it would subordinate its mortgage against the Foundry property to the Pine Banks mortgage. It further asserted that Pine Banks advanced funds to Foundry Realty believing it was obtaining a first mortgage based upon these representations. It added that "LBM gave no indication that it intended to utterly disregard its initial representations" and that when Pine Banks sought to foreclose LBM did not assert any interest in the property even though it had notice. Finally it represented that "Pine Banks and later 14 Beach Street Realty Trust and Shamus relied upon these representations and actions with respect to the Foundry Property." The Court finds that these assertions do not support a claim for equitable estoppel, particularly because no representations were made to the Debtor and the Debtor was fully aware that LBM was intending to foreclose its mortgage when it acquired the Foundry property in July of 2007.

In Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722 (1974), the court recognized essential

16

elements giving rise to an estoppel, namely

> (1) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3) Detriment to such person as a consequence of the act or omission.

Id. at 728 (citations omitted). *See also* Dunkin' Donuts Inc. v. Panagakos, 5 F.Supp.2d 57, 61 (D. Mass. 1998). The Court finds that the Debtor did not allege any of the elements required to support a claim for equitable estoppel. Ross's role as counsel to Pine Banks and the recipient of LBM's representations, as well as his positions as Trustee of 14 Beach Street Nominee Trustee and manager of the Debtor, cannot be collapsed for this Court both to disregard the separate legal entities involved in the chain of title to the Foundry property and to conclude that the Debtor has alleged a viable exception to the Statue of Frauds. Additionally, the case upon which the Debtor relies in support of its equitable estoppel argument, Platt v. Socrates Squire, 53 Mass. 494 (1847), is inapposite. When the Debtor acquired the Foundry property, it was not mislead in any way, shape, or form as to the subordination or discharge of LBM's mortgage in relation to the Pine Banks mortgage. As noted by LBM, "any review of the title to the Foundry property would have revealed that the LBM mortgage remained outstanding as the first mortgage of record."

E. Count IV

Through Count IV, the Debtor asserts that it acquired the Foundry property with the reasonable expectation that LBM would subordinate its mortgage to the Pine Banks mortgage or acknowledge its obligation to discharge the mortgage upon completion of the

lobby and elevator at the East Second Street property and that LBM is likely to be unjustly

enriched absent relief. In In re McCabe, 345 B.R. 1 (D. Mass. 2006), the court outlined the

requirements for a claim for unjust enrichment. It stated:

> [A] plaintiff must show
>> (1) an enrichment; (2) an impoverishment; (3) a relation
>> between the enrichment and the impoverishment; (4) an
>> absence of justification and (5) the absence of a remedy
>> provided by law.
>
> The purpose of a cause of action for unjust enrichment is to "provide[ ] an
> equitable stopgap for occasional inadequacies in contractual remedies at
> law". Thus, it may be maintained as a cause of action where available legal
> remedies do not "cover[ ] the entire case made by the bill in equity". Where
> the relationship of the parties is governed by contract, "the contract provides
> the measure of the plaintiff's right and no action for unjust enrichment lies".

Id. at 9 (citations omitted). See also In re Healthco Internat'l, Inc., 195 B.R. 971, 989 (Bankr.

D. Mass. 1996).

The Debtor's allegations in support of Count IV are meager and fail the Twombly

test. Not only did the Debtor fail to plead an absence of a remedy at law, it allegations that

it acquired the Foundry property with the reasonable expectation that LBM would

subordinate the its mortgage to Pine Banks are contradicted by its allegation that  LBM

refused to deliver a written subordination of its mortgage at the time General Banks did

so in November of 2003 and refused to discharge its mortgage in 2006 when 655 Corp.

completed certain construction benchmarks. In view of the pending foreclosure sale at the

time the Debtor acquired the Foundry property from 14 Beach Street Nominee Trust, the

Debtor failed to set forth any plausible allegations as to how it was impoverished as a

result of any acts or omissions on the part of LBM.

18

F. Count V

Through Count V, the Debtor alleges that LBM repeatedly misrepresented to Ross and Pine Banks that it would subordinate the LBM Mortgage, that LBM's misrepresentations were material, were made with the intention that Pine Banks rely upon them, that Pine Banks reasonably relied and that LBM's misrepresentations have caused and will continue to cause harm to the Debtor. The Court finds that the Debtor's allegations with respect to Count V do not constitute "a plausible entitlement to relief." Because no misrepresentations were made *to the Debtor*, the Debtor could not have reasonably relied upon them or have been harmed by them. As with its other counts, the Debtor seemingly ignores the chain of title to the Foundry property and the existence of distinct entities having ownership interests in it. While the Debtor alleges that representations were made to Ross, those representations were made to him as counsel to Pine Banks, not as manager of the Debtor. Moreover, the Debtor, while a successor in title to the Foundry property, did not allege that it received assignments of causes of action that belonged to its predecessors in title. Moreover, as LBM correctly points out, the Debtor did not plead its fraud count with particularity. It did not allege the date, place or actual words used in connection with the misrepresentations.

G. Count VI

Through Count VI, captioned Equitable Subrogation, the Debtor seeks a determination that "[t]he junior LBM Mortgage was extinguished by the foreclosure sale." It alleges that Foundry Realty granted FIG a mortgage on May 22, 2002; that Foundry

19

Realty granted LBM a mortgage on May 9, 2003, which was subordinate to the FIG

mortgage; that Pine Banks loaned Foundry Realty $760,000 in November 2003, proceeds

of which were used by Foundry Realty to satisfy the FIG note and mortgage; that Pine

Banks made the payment to FIG to protect its own interest; that Pine Banks in making the

payment to Foundry Realty did not act as a volunteer; that Pine Banks was not primarily

liable for the FIG note and mortgage; that subrogation of Pine Banks rights to FIG's rights

would not work any injustice upon LBM; that LBM's "second" mortgage was extinguished

by the foreclosure sale conducted by Pine Banks, resulting in the Debtor's ownership of the

Foundry property free and clear of LBM's mortgage.

In Cruickshank v. Clean Seas Co. (In re Dolphinite, Inc.), 346 B.R. 571 (D. Mass.

2006), the court observed:

> "Subrogation is an old term, rooted in equity," which today is used to mean
> "stand in the shoes of." Nat'l Shawmut Bank of Boston v. New Amsterdam
> Cas. Co., Inc., 411 F.2d 843, 844 (1st Cir.1969). "The equitable principle is that
> when one, pursuant to obligation-not a volunteer, fulfills the duties of
> another, he is entitled to assert the rights of that other against third persons."
> Id. See also City of Cambridge v. Hanscom, 186 Mass. 54, 56-57, 70 N.E. 1030,
> 1031 (1904) (commonwealth's payment of city's obligation entitled
> commonwealth to become subrogated to the right of the city against the
> defendants). "Rights of subrogation, although growing out of a contractual
> setting and ofttimes articulated by the contract, do not depend for their
> existence on a grant in the contract, but are created by law to avoid injustice."
> Canter v. Schlager, 358 Mass. 789, 792, 267 N.E.2d 492, 494 (1971). It "covers
> only those situations where one party pays a debt for which another party
> is primarily liable." A.N. Deringer, Inc. v. Consol. Computer Servs. Int'l, Inc.,
> 381 F.Supp. 1208, 1211 (D.Mass.1974).

346 B.R. at 581. See also In re North Amer. Rubber Thread Co., Inc., 333 B.R. 164, 168

(Bankr. D. Mass. 2005)("Equitable subrogation occurs where one party, by virtue of its

payment of another's obligation, steps into the shoes of the party who was owed the obligation for purposes of getting recompense for its payment."); East Boston Savs. Bank v. Ogan, 428 Mass. 327 (Mass. 1998). In Ogan, the Supreme Judicial Court enunciated five factors which a court must determine for equitable subrogation to apply:

> (1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer,[(3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice to the rights of the junior lienholder.

Id. at 330(footnote omitted) (citing Mort v. United States, 86 F.3d 890, 894 (9th Cir.1996), and Han v. United States, 944 F.2d 526, 529 (9th Cir.1991)). In a footnote, the court added: "Some courts, in applying our case law in this area, understandably have termed our subrogation theory to be one of "unjust enrichment" because of the importance we have placed on balancing the interests of all mortgagees. Id. at 334 n. 2 (citation omitted.). In Massachusetts, "'[i]t is the general rule that, where a mortgage has been discharged by mistake, equity will set the discharge aside and reinstate the mortgage to the position of the parties intended to occupy where the rights of intervening lienors have not been affected.'" Id. at 328 (citing North Easton Coop. Bank v. MacLean, 300 Mass. 285, 292 (1938)).

Because Pine Banks, not the Debtor, paid a debt for which another party was primarily liable (i.e., Foundry Realty's debt to FIG), the determination of whether the Debtor has stated a cause of action depends upon whether it can "stand in the shoes" of Pine Banks and, ultimately, whether Pine Banks is entitled to stand in the shoes of FIG. This

issue must be resolved with reference to the Debtor's standing to assert a claim that may have at one time belonged to Pine Banks.

The Court finds that the Debtor lacks standing, both constitutional and procedural, to assert its equitable subrogation claim. In its Objection to Claim and Counterclaim, the Debtor alleged that Pine Banks foreclosed on the Foundry property; was the highest bidder at the foreclosure sale; and subsequently conveyed the Foundry property to Ross as Trustee of the 14 Beach Street Realty Trust for $760,000. As a result, Pine Banks no longer has a claim for equitable subrogation. Its mortgage debt, which was incurred in November of 2003, approximately six months after the LBM mortgage was recorded, was satisfied upon the transfer of the Foundry property to Ross as Trustee of the 14 Beach Street Realty Trust. Both its mortgage and that of FIG have been discharged. At this time, Pine Banks cannot assert a claim for equitable subrogation against LBM. Accordingly, if Pine Banks cannot assert the claim, neither can the Debtor on its behalf, even if in 2003 or 2004 Pine Banks may have had such a claim against LBM. Pursuant to the Supreme Court's decision in Lujan, 505 U.S. at 560-61, and the United States Bankruptcy Appellate Panel for the First Circuit's decision in In re Newcare Health Corp., 244 B.R. at 170, the Debtor cannot assert rights which Pine Banks no longer has. Thus, the Debtor's claim for equitable subrogation fails.

H. Counts VII and VIII

Through Count VII, the Debtor seeks to recharacterize the note executed by 655 Corp. to LBM as equity because 1) Mallegni, the managing member of LBM, was an insider

of 655 Corp. when the note was issued and effectively controlled 655 Corp. as trustee of the
voting trust; 2) General Bank was unwilling to make a construction loan to 655 Corp
without the infusion of $1.2 million in equity; 3) on May 9, 2003 no actual loan was made,
although various documents were executed; 4) neither LBM nor 655 Corp. treated the note
as a loan and 655 Corp. made no payments; 5) the term of the note was only four months,
although development would take months if not years; and 6) Mallegni through LBM
continued to loan money to 655 Corp. and its related entities long after 655 Corp. defaulted
on its obligation to LBM. Based upon these allegations, the Debtor avers that LBM's claim
should be disallowed because, once recharacterized as equity in 655 Corp., it does not
support Foundry Realty's guaranty which Foundry Realty secured with a mortgage on the
Foundry property now owned by the Debtor.

Through Count VIII, the Debtor maintains that the guaranty executed by Foundry
Realty of 655 Corp.'s obligation to LBM fails for lack of consideration, thereby rendering
LBM's mortgage void or voidable. Counts VII and VIII are opposite sides of the same coin:
the absence of consideration for 655 Corp.'s note or Foundry Realty's mortgage securing
its guaranty. In other words, if no debt existed between LBM and 655 Corp., there could
be no consideration for the guaranty of that debt by Foundry Realty. The legal issues,
however, are whether the Debtor may seek to recharacterize the debt of another entity as
equity or whether it may obtain a determination that LBM's mortgage is void because of
the absence of consideration. Both issues raise the question of the Debtor's standing to
assert counts VII and VIII.

In <u>In re Atlantic Rancher, Inc.</u>, 279 B.R. 411 (Bankr. D. Mass. 2002), this Court

extensively discussed the recharacterization cause of action and outlined numerous factors

which courts consider in determining whether to recharacterize debt as equity.   These

include:

> (1) the adequacy of capital contributions;
> (2) the ratio of shareholder loans to capital;
> (3) the amount or degree of shareholder control;
> (4) the availability of similar loans from outside lenders;
> (5) certain relevant questions, such as
> > (a) whether the ultimate financial failure was caused by undercapitalization;
> > (b) whether the note included payment provisions and a fixed maturity date;
> > (c) whether a note or other debt document was executed;
> > (d) whether advances were used to acquire capital assets; and
> > (e) how the debt was treated in the business records.

279 B.R. at 433-34 (quoting <u>In re Hyperion Enterprises, Inc.</u>, 158 B.R. 555, 561 (D. R.I. 1993)).

With respect to Count VIII, Failure of Consideration, Massachusetts courts have held

that "[c]onsideration is one of the three elements needed to form a binding contract. An

element of a contract . . . is not a cause of action."   <u>Bateman v. Republic Fin. Corp.</u>, No.

061956BLS1, 2006 WL 2425011 at *12 (Mass. Super. Aug. 2, 2006).   Moreover, "[t]he signing

of a document under seal is adequate consideration to support a valid agreement."   <u>Holt

v. F.D.I.C.</u>, 216 B.R. 71, 76 (D. Mass. 1997).

LBM urges the Court to dismiss Counts VII and VIII.   With respect to the

recharacterization count it observes that "[w]here the dispute between Shamus and LBM

arises in a completely different context, the factors ordinarily considered in connection with

a claim for recharacterization . . . are simply in applicable . . . and make[s] no sense."   LBM

also maintains, citing <u>Bateman</u>, that, in the absence of a contractual relationship between LBM and the Debtor, the claim of failure of consideration has no independent viability, and, in any event, the Foundry guaranty was executed under seal, implicating the presumption of consideration as noted by the court in <u>Holt</u>.

With respect to Count VII, the Court finds that the Debtor lacks standing to assert a separate cause of action for the recharacterization of 655 Corp.'s debt to LBM as equity. That cause of action belongs to the Chapter 11 Trustee of 655 Corp., not the Debtor, and, accordingly, the Debtor lacks standing to assert that claim. *See* <u>In re Newcare Health Corp.</u>, 244 B.R. at 170.

With respect to the failure of consideration count, the Court finds that the Debtor also has failed to state a separate and distinct cause of action. Nevertheless, the Debtor can raise failure of consideration as part of its Objection to LBM's proof of claim and as a defense to its enforcement of the mortgage securing Foundry Realty's guaranty. *See* 11 U.S.C. § 502(b)(1). As stated by the court in <u>In re Millivision, Inc.</u>, 328 B.R. 1 (Bankr. D. Mass. 2005), "[a]n agreement under which a party parts with no value is void for failure of consideration." <u>Id.</u> at 9 (citing <u>Trustees of Amherst Academy v. Cowls</u>, 23 Mass. 427, 432-33 (1828)). *See also* <u>Tenney v. Prince</u>, 24 Mass. 243 (1828) ("The mere naked promise in writing to pay the existing debt of another, without any consideration therefor, is void.").

> A guaranty, however, which is executed at the same time as or before the primary obligation, *may rest upon the same consideration as the original contract*. And where the guaranty is without date, the plaintiff is entitled to the benefit of a presumption that it was executed at the time of the primary obligation

25

where the evidence does not prove otherwise. But where the guaranty is given after the execution of the principal contract, the plaintiff must prove a new and separate consideration.

Richard W. Bishop, The Contract of Guaranty-Consideration, 17 Mass. Practice Series, § 11.7 (5th ed.) (emphasis supplied, footnotes omitted). At common law in Massachusetts a contract is conclusively presumed to be supported by adequate consideration if it is sealed, see Mass. Gen. Laws ch. 4, § 9A; Cadle Co. v. Boston Investors Group, L.P., No. 96-11152-WGY, 1997 WL 106904 (D. Mass. Jan. 30, 1997); Chem-Lac Products v. Gerome, 327 Mass. 394 (1951); Howard J. Alperin, Consideration - Contracts Under Seal, 14 Mass. Prac. § 5.17 (4th ed.). But see Thomas v. Webster Spring Co., Inc., 37 Mass. App. Ct. 180, 183 (1994) ("When an instrument under seal promises consideration, failure of consideration can be shown despite the seal."). Cf. Knott v. Racicot, 442 Mass. 314 (2004) (abolishing rule that proof of consideration is required for option contracts under seal and adopting Restatement (Second) of Contracts § 87(1)(1981)).

In summary, the Court finds that the Debtor may assert that absence of consideration for 655 Corp.'s debt to LMB and/or the absence of consideration for Foundry Realty's guaranty, secured by a mortgage, of 655 Corp.'s debt to LBM as part of its Objection to Claim and as a defense to LBM's attempts to enforce its mortgage on the Foundry property, but not as separate causes of action.

I. Count X

Through Count X, the Debtor seeks damages for LBM's unfair and deceptive acts. It alleged that LBM's conduct has been "willful and intentional," entitling Shamus to

26

recover treble the amount of actual damages plus cost, including reasonable attorneys' fees. In view of the Court's rulings with respect to Counts II through IX, the Court finds that the Debtor has failed to set forth a plausible entitlement to relief under Ch. 93A. The Court shall enter an order granting LBM's Motion to Dismiss Count X without prejudice to renewal by the filing of an amended Counterclaim should evidence develop warranting such relief. Should the Debtor produce compelling evidence in support of its Objection to LBM's claim, the Court may, in the future, consider a Motion to Amend to add a claim for relief under Ch. 93A.

J. Count I

Through Count I, the Debtor seeks a declaratory judgment as to the validity, extent and priority of the LBM mortgage and seeks declaratory judgment with respect to Counts II, V, VI, VII, VIII, and Count IX. Because of the Court's ruling with respect the foregoing Counts, the Court grants LBM's Motion to Dismiss Count I of the Debtor's Counterclaim.

**V. CONCLUSION**

Upon consideration of the foregoing, the Court shall enter an order granting LBM's Motion to Dismiss the Debtor's ten counterclaims. Moreover, to the extent the Debtor's Objection to LBM's proof of claim is predicated upon relief under Counts I, II, III, IV, V, VI, IX and X, the Court shall enter an order granting LBM's Motion to Dismiss. The Court shall enter an order denying LBM's Motion to Dismiss the Debtor's Objection to the extent the Objection rests upon the content of Counts VII and VIII of its Counterclaim. The Court shall not dismiss this adversary proceeding as the Objection is a contested matter pursuant

27

to Fed. R. Bankr. P. 9014.  The Court directs that the adversary rules shall apply to this

proceeding.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: August 6, 2008