# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In Re:** ) <br> ) <br> **SHAMUS HOLDINGS, LLC,** ) <br> ) <br>         **Debtor.** ) <br> ) | **Chapter 11** <br> **Case No. 07-14572-JNF** |
| **SHAMUS HOLDINGS, LLC,** ) <br> ) <br>         **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **LBM FINANCIAL, LLC,** ) <br> ) <br>         **Defendant.** ) | **Adversary Proceeding** <br> **No. 08-01030** |

## FIRST AMENDED OBJECTION TO CLAIM

### Preliminary Statement

Debtor, Shamus Holdings, LLC (the "Debtor" or "Shamus") hereby files this First Amended Objection pursuant to Section 506 of the United States Bankruptcy Code and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure to the alleged secured claim asserted by LBM Financial, LLC ("LBM") against property of the Debtor known as Unit C-1 of the Foundry Condominium located at 314-330 West Second Street, South Boston, Massachusetts ("the Foundry Property"), a 6,000 square foot commercial condominium unit.

LBM is a notorious "hard money" lender engaged in the business of lending money primarily to real estate developers. LBM imposes extremely high interest rates, points and exorbitant fees on its borrowers. In addition, LBM's principal, Marcello Mallegni ("Mallegni"), routinely demands equity in the borrowers' business, even <u>after</u> LBM has committed to make a

loan to the borrower without any such equity rider. When the borrower is most vulnerable, Mallegni and his agents also extort fees and other financial compensation and engage in whatever fraudulent or dishonest conduct suits their purposes even to the point of forcing third parties into bankruptcy through the pursuit of foreclosure actions predicated upon invalid mortgages.

In this case, Mallegni secured a 100% ownership stake from LBM's "borrower", 655 Corp., thereby obtaining control over its condominium development in South Boston, control which he exercised until the Court appointed a Chapter 11 trustee in 2007. Indeed, Mallegni exercised pervasive control over 655 Corp. even <u>after</u> it became a Chapter 11 debtor before this Court.

As further set forth below, the guaranty and mortgage upon which LBM's claim is based arise out of a sham loan transaction and are invalid and unenforceable on several different grounds. The alleged secured claim asserted by LBM in this case should be disallowed in its entirety.

1. On or about September 21, 2007, LBM filed a Proof of Claim ("LBM Claim") in this case, pursuant to which it seeks to recover $4,154,610.92 on account of an alleged loan transaction with 655 Corp. which loan was allegedly guaranteed by Foundry Realty LLC and secured by a mortgage against the Foundry Property. A true and accurate copy of the LBM Claim is annexed hereto and incorporated by reference herein as <u>Exhibit A</u>. As further set forth below, the mortgage granted by Foundry Realty was issued in connection with a sham loan transaction that was designed by Mallegni and LBM to induce General Bank (now known as Cathay Bank) to make a $5.6 million construction loan that would enable Mallegni's partner, William DiPietri, to retire his prior investment in the 655 Corp. condominium project.

2.

BOS-1274694 v3

## PARTIES

2. Shamus is a limited liability company duly organized and existing under the laws of the Commonwealth of Massachusetts having a usual place of business at 376 Boylston Street, Boston, Massachusetts. Shamus acquired the Foundry Property from the 14 Beach Street Realty Trust on July 19, 2007.

3. LBM is a limited liability company duly organized and existing under the laws of the Commonwealth of Massachusetts having a usual place of business at 171 Locke Drive, Marlborough, Massachusetts. At all times relevant hereto, LBM was owned and controlled by Mallegni, its sole member and manager. A notorious hard money lender, LBM charges its borrowers exceptionally high interest, points and fees on each of its loans. Even after LBM has issued a commitment to make a loan, Mallegni routinely demands that LBM borrowers grant him and his counsel, Michael J. Norris, an equity stake in the borrower's business. If and when one of LBM's borrowers defaults or becomes vulnerable, Mallegni and Norris extort additional equity, fees and other financial gratuities as a condition of LBM's forbearance and cooperation.

## RELATED PARTIES

4. Foundry Realty, LLC ("Foundry Realty") is limited liability company organized and existing under the laws of the Commonwealth of Massachusetts having a former place of business at the Foundry Property. At various times relevant to these proceedings, Foundry Realty was an affiliate of numerous other entities including, without limitation, 655 Corp., Platinum Investment Services, Kirsten Corp., City-Scapes L.P., SOS Realty LLC, The Geneva LLC, On Broadway Corporation, Hibel Realty LLC, LJB Realty LLC, BF Realty Trust, Marba Corp., Main Street Brewing d/b/a Irish Times, RMB Trust, SB Construction, 320 Corp., 1742 Liberty Street Realty LLC, Adam Corp., FB Main, FKB, Inc., KBF Sales and Janus Development (collectively the "655 Affiliates").

5. Bernard Laverty ("Laverty") is an individual resident of Massachusetts. At all times relevant to these proceedings, Laverty was one of two owners of equity in Foundry Realty.

6. Barry Queen ("Queen") is an individual resident of Massachusetts. At all times relevant to these proceedings, Queen was one of two owners of equity in Foundry Realty.

7. Robert Bradley ("Bradley") is an individual resident of Massachusetts.

8. Francis Fraine ("Fraine") is an individual resident of Massachusetts.

9. Attorney Frank D. Kirby ("Kirby") is an individual resident of Massachusetts.

10. Stuart Sojcher ("Sojcher") is an individual resident of Massachusetts. At all times relevant hereto, Sojcher was the nominal manager of Foundry Realty.

11. Wolfpen Financial, LLC ("Wolfpen") is a limited liability corporation duly organized and existing under the laws of the Commonwealth of Massachusetts having a usual place of business at 171 Locke Drive, Marlborough, Massachusetts. Like LBM, Wolfpen is a private lender of last resort engaged in the business of lending money to individuals and entities, primarily for real estate development. Wolfpen's only two members were Mallegni and William DiPietri ("DiPietri"). Mallegni is the managing member of Wolfpen.

12. Mallegni is an individual residing at 6 Wolfpen Lane, Southborough, Massachusetts. At all times relevant to these proceedings, Mallegni was (i) the manager and one of two members of Wolfpen and (ii) the sole manager and member of LBM.

13. Attorney Michael J. Norris ("Norris") is an individual resident of Massachusetts.

14. Attorney Vincent "J." DiMento ("DiMento") is an individual resident of Massachusetts.

**JURISDICTION AND VENUE**

15. On July 25, 2007 ("Petition Date"), Shamus commenced this bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

4.

16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §157 and §1334, this being an action arising in and related to the Title 11 case of Shamus Holdings LLC. The objection to claim and counterclaims asserted are "core" matters, as that term is defined in 28 U.S.C. §157(b)(2), including but not limited to claims relating to disallowance of the LBM Claim.

17. Venue in this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.

## FACTS

### The Wolfpen Mortgage

18. 655 Corp. is a real estate development company, whose sole asset is the 18 unit condominium development located at 653-659 East Second Street, South Boston, Massachusetts (the "East Second Street Property"). Prior to 2002, 655 Corp. was owned and controlled by Fraine, Bradley and Kirby.

19. In late 2001 or early 2002, Bradley proposed to Mallegni a joint venture to acquire and develop the "East Second Street Property". In furtherance of this joint venture, on or about March 13, 2002, Mallegni, Dipietri, Kirby, Bradley, Fraine (who was not formally identified as a 655 Corp. shareholder) executed an "Inducement and Shareholder's Agreement" and a separate Stock Transfer Agreement pursuant to which Bradley, Fraine and Kirby transferred twenty-five percent (25%) of the outstanding stock in 655 Corp. to Wolfpen's only members, Mallegni and Dipietri (i.e. 12.5% each). The Inducement Agreement further provided that Mallegni and Dipietri were to "receive … distributive funds or profits" and were to "review and approve all contracts, loan agreements, and each and every other cost, fee, or expense associated with the development of the [East Second Street] [P]roperty."

20. On or about March 13, 2002, the 655 Corp. shareholders, which then included

Mallegni (12.5 shares) and DiPietri (12.5 shares) executed an agreement titled the "655 Corporation Voting Trust" ("655 Trust"), pursuant to which <u>all</u> existing shares of 655 Corp. stock were transferred to Mallegni, as Trustee of the trust. Under the 655 Trust, Mallegni possessed the "full and unqualified right and power to vote… all or any of the Trust Stock… [and] possess[ed] and [was] entitled in his discretion to exercise all stockholders rights of every name and nature…" The 655 Trust was terminable only (i) upon the death of Mallegni and each other beneficiary, (ii) by written instrument executed by the beneficial holders of at least seventy-six percent (76%) of 655 Corp.'s outstanding shares, or (iii) on March 14, 2007, whichever came first. In other words, absent the written agreement of Mallegni and DiPietri, the 655 Trust would continue in existence for five years through March 14, 2007.

21.  On or about March 13, 2002, Wolfpen loaned $2,275,000 to 655 Corp. pursuant to a written promissory note ("Wolfpen/655 Note"). The Wolfpen/655 Note had a term of six months and therefore, became due and payable in September, 2002. 655 Corp. secured the Wolfpen/655 Note with a mortgage against the East Second Street Property ("Wolfpen Mortgage"). Fraine, Bradley and Kirby personally guaranteed the Wolfpen/655 Note. On Broadway Corp. also guaranteed the Wolfpen/655 Note and collateralized its guarantee with a mortgage of its property at 420 West Broadway, South Boston, Massachusetts.

**The FIG Mortgage**

22.  Upon information and belief, Faneuil Investors Group Limited Partnership ("FIG") is a limited partnership in the business of real estate development and finance. Prior to May 22, 2002, FIG owned the Foundry Property.

23.  On or about May 22, 2002, FIG sold the Foundry Property to Foundry Realty for a purchase price of $600,000. On or about May 22, 2002, Foundry Realty granted FIG a first

6.

priority mortgage on the Foundry Property ("FIG Mortgage") to secure $540,000 of the purchase price.

**General Bank and the LBM Mortgage**

24. In the Fall of 2002, 655 Corp. approached General Bank for a $5,600,000.00 construction loan with which to complete the construction and development of the East Second Street Property. At that time, 655 Corp. indicated to General Bank that its principal owners were Mallegni and DiPietri.

25. General Bank, through its Senior Vice President, Linda Moulton, recommended the loan for approval on the condition that 655 Corp. would invest $1,200,000.00 of equity in the project. General Bank approved the loan, among other things, on the strength of the relationship it wanted to develop with Mallegni. While the General Bank loan was supposed to provide 655 Corp. with sufficient funds to complete construction at the East Second Street Property, it would only accommodate $1,598,000 with which 655 Corp. could pay Wolfpen. At the time, DiPietri was insisting that his portion of the Wolfpen/655 Note be repaid. Mallegni agreed that the funds available from the General Bank loan (i.e. $1,598,000) would repay DiPietri and that $1,200,000 of his interest in the Wolfpen loan would remain in the East Second Street Property as equity.

26. Upon information and belief, Mallegni did not want it to be generally known that he was an owner of 655 Corp. In the Spring of 2003, Queen and Laverty were installed as the nominal owners and officers of 655 Corp. Queen and Laverty played similar roles with numerous other 655 Affiliates.

27. On May 9, 2003, Mallegni and 655 Corp. documented a sham loan transaction which gave the appearance of a $1,200,000 capital infusion into the East Second Street project but which maintained Mallegni's senior position in the capital structure of 655 Corp.

Specifically, 655 Corp. issued a Promissory Note to LBM in the original principal sum of $1,200,000 ("LBM/655 Note"), together with a mortgage against the East Second Street Property. Even though the East Second Street project would not be completed for more than a year and even though the anticipated construction loan from General Bank was for an initial term of two years, the LBM/655 Note matured only four months after it was issued on September 9, 2003, a date that was later extended through April 9, 2004.

28.     On May 9, 2003, Foundry Realty executed a "guaranty" of the LBM/655 Note (the "Foundry Guaranty"). Foundry also granted LBM a mortgage against the Foundry Property to secure the Foundry Guaranty ("LBM Mortgage"). The stated term of the LBM Mortgage was four months. LBM agreed to discharge the LBM Mortgage and certain other collateral including Laverty's and Fraines's homes upon completion of the lobby and elevator at the East Second Street Property. At no time after the LBM Mortgage was recorded (through at least January 7, 2009) with the Suffolk Registry of Deeds has LBM recorded an extension of the mortgage or an acknowledgement or affidavit indicating that the LBM Mortgage was not satisfied.

29.     Foundry received no consideration in exchange for either the Foundry Guaranty or the LBM Mortgage. The "loan" allegedly evidenced by the LBM/655 Note was extended to 655 Corp., an entity owned by Mallegni and DiPietri, and over which Mallegni maintained exclusive control by virtue of the 655 Trust. Foundry Realty, on the other hand, was managed by Stuart Sojcher and owned by Laverty and Queen. Foundry Realty received no legally cognizable benefit or consideration in exchange for the Foundry Guaranty and LBM Mortgage.

30.     By letter dated May 11, 2003, Queen advised General Bank that:

> This letter is to confirm that as of the above date 655 Corporation paid the sum of ONE MILLION TWO HUNDRED THOUSAND ($1,200,000.00) DOLLARS in good funds to WolfPen Financial in partial retirement of the $2,800,000.00 current financing on the

> building located at 653-655 East Second Street, S. Boston, MA 02127. The partial retirement is in anticipation of the construction loan to be placed on the building by your financial institution for the construction and sale of 18 condominiums. It is my understanding with WolfPen that upon your financial institution tendering ONE MILLION FIVE HUNDRED NINETY EIGHT THOUSAND FIVE HUNDRED ($1,598,500.00) DOLLARS to WolfPen a full discharge of their mortgage will be recorded.

31. On May 12, 2003, LBM purported to fund the alleged loan evidenced by the LBM/655 Note by delivering a check in the amount of $1,200,000 to Norris, its closing attorney who deposited the funds into his IOLTA account. That same day, Norris issued a $2,815,000.00 check payable to Wolfpen as payoff for the Wolfpen/655 Note. Upon information and belief, that check was not delivered until after the General Bank Loan was funded on May 14, 2003.

32. Notwithstanding the fact that Mallegni and DiPietri were each 50% members of Wolfpen, on May 13, 2003, Wolfpen issued a check in the amount of $1,391,100.39 to LBM and a second check in the same amount to Rosewood Development (an affiliate of DiPietri). Upon information and belief, these checks were not delivered until after the General Bank Loan was funded on May 14, 2003.

33. On May 14, 2003, General Bank closed the $5,600,000 construction loan with 655 Corp. ("General Bank Loan"). From the initial loan proceeds, $1,598,000 was wired by General Bank to Norris, who then delivered to Wolfpen the check for $2,815,000. The Wolfpen check to LBM for $1,391,100.39 cleared into LBM's account on May 16, 2003. As a result of this series of checks, LBM recovered more than 115% of its alleged $1,200,000 "loan" to 655 Corp. within four calendar days after it allegedly funded it. Upon information and belief, despite satisfaction of the Wolfpen/655 Note, Mallegni failed to discharge the Wolfpen Mortgage.

34. Under the Construction Loan Agreement with General Bank, 655 Corp. could not borrow money or encumber the East Second Street Property without the prior written consent of

9.

General Bank. In addition, any funds advanced to the project by the owners of 655 Corp. were required to be made in the form of equity. Despite these clear (and customary) negative covenants, LBM recorded a mortgage against the East Second Street Property on May 14, 2003 and <u>seven</u> (7) subsequent mortgages.

35.   The General Bank Loan was secured by: (a) a first mortgage against the East Second Street Property ("General Bank Mortgage"); and (b) a second mortgage against the Foundry Property (subordinate only to the FIG Mortgage). The General Bank Loan was due and payable in two years on May 14, 2005.

36.   Like LBM, General Bank agreed to discharge its mortgage against the Foundry Property and other collateral, including Laverty's and Fraine's homes upon completion of the lobby and elevator at the East Second Street Property. When the lobby and elevator were completed in 2006, General Bank released its mortgage against the Foundry Property and other properties, but LBM did not.

37.   Mallegni remains the controlling shareholder of 655 Corp. to this day. In fact, by written agreement dated August 11, 2006, LBM installed DiMento to oversee the completion and sale of the East Second Street project. Since 2002, DiMento has been a business partner in several real estate projects with Mallegni and he has periodically provided legal counsel to Mallegni and/or LBM as well.

**The Pine Banks Mortgage**

38.   Upon information and belief, after the FIG Note matured, FIG threatened to foreclose upon the Foundry Property unless it was paid. As a result, Foundry Realty sought refinancing for the FIG Note and Mortgage.

39.   In or about November 2003, Charles J. Housman, Trustee of the Pine Banks

10.

Nominee Trust ("Pine Banks") agreed to refinance the FIG Note and Mortgage. Pine Banks was at all times relevant to these proceedings represented by Attorney Steven A. Ross ("Ross").

40. In connection with the Pine Banks loan, Mallegni and Norris represented to Ross, Laverty and Sojcher that LBM would subordinate the LBM Mortgage to the proposed mortgage loan from Pine Banks.

41. General Bank also agreed to subordinate its mortgage against the Foundry Property to the proposed mortgage loan from Pine Banks.

42. In reliance upon the agreement of LBM and General Bank to subordinate their respective mortgages against the Foundry Property, on or about November 12, 2003, Pine Banks loaned Foundry Realty $760,000. In connection therewith, Pine Banks was granted a mortgage on the Foundry Property ("Pine Banks Mortgage"), a mortgage that Ross and Pine Banks believed would be a first priority lien against the property.

43. The proceeds of the Pine Banks/Foundry Note were used to satisfy the FIG Note and Mortgage. In consideration of that payment, the FIG Mortgage was discharged.

44. On or about November 14, 2003, General Bank executed a written subordination agreement pursuant to which General Bank subordinated its mortgage on the Foundry Property to the mortgage granted to Pine Banks. Pine Banks and Ross relied upon Sojcher to memorialize the subordination with both General Bank and LBM. Although General Bank honored its commitment, LBM did not (and later refused to) deliver a written subordination agreement in favor of Pine Banks.

**The Other LBM/655 Loans**

45. The LBM/655 Note matured on September 9, 2003. After the Note was extended, it matured again on April 9, 2004. Thereafter, and while the LBM/655 Note was in default,

11.

LBM made no less than six (6) subsequent loans to 655 Corp. and no less than ten (10) loans to various 655 Affiliates. Loans to 655 Corp. were made on the following dates and in the following amounts (collectively, the "Other LBM/655 Loans"):

- March 12, 2004 for $2,000,000;
- April 7, 2004 for $418,500;
- April 7, 2005 for $850,000;
- January 27, 2006 for $2,432,000;
- September 20, 2006 for $43,735 (debtor-in-possession financing); and
- November 10, 2006 for $2,000,000 (debtor-in-possession financing).

46.     Upon information and belief, the January 2006 loan refinanced and consolidated the April 2004 and the April 2005 loans. Upon information and belief, despite satisfaction of the April 2004 and April 2005 Loans, Mallegni and LBM failed to discharge the mortgages securing those loans until October 2007.

47.     655 Corp. requested that LBM consolidate the Other LBM/655 Loans with the $1,200,000 LBM/655 Note, but LBM refused.

48.     In total, LBM purported to loan 655 Corp. over $6,000,000 (including debtor-in-possession financing) *after* the LBM/655 Note was in default.

**Hibel Realty LLC**

49.     One of the 655 Affiliates, Hibel is a limited liability company engaged in the business of real estate development in Hyannis, Massachusetts. Its members have included Mallegni, DiMento, Laverty and Bradley.

50.     Since December 2003, LBM purports to have made the following loans to Hibel in the following amounts:

12.

- December 22, 2003 for $675,000;

- March 12, 2004 for $2,000,000 (co-maker on the 655 Corp. loan of even date);

- April 27, 2005 for $510,000;

- March 17, 2006 for $1,330,000; and

- February 16, 2007 for $3,530,000 (collectively, the "LBM/Hibel Loans").

51. The LBM/Hibel Loans were secured by mortgages on Hibel's real estate in Hyannis, Massachusetts and by guarantees and mortgages against property owned by numerous other 655 Affiliates.

52. Upon information and belief, the February 2007 loan refinanced and consolidated the December 2003, April 2005, and March 2006 loans. Upon information and belief, notwithstanding satisfaction of the April 2005 and March 2006 loans, Mallegni and LBM failed to discharge the mortgages securing those loans until September 2007.

53. In total, LBM purports to have loaned Hibel approximately $3,530,000 *after* the LBM/655 Note was in default.

**SOS Realty, LLC**

54. Another 655 Affiliate, SOS is a limited liability company engaged in the business of real estate development in West Roxbury, Massachusetts. Its members have included Laverty, Queen and DiMento.

55. SOS was formed to develop the property located at Washington Street, West Roxbury, Massachusetts ("Washington Street Property") into approximately 48 residential condominiums.

56. LBM purports to have made numerous loans to SOS to fund the development of

13.

the Washington Street Property, including but not limited to:

- September 3, 2004 for $400,000;
- January 10, 2005 for $100,000;
- January 26, 2005 for $300,000;
- June 16, 2005 for $500,000; and
- September 21, 2005 for $500,000 (collectively, the "LBM/SOS Loans").

57.     Each of the LBM/SOS loans was secured by a junior mortgage against the Washington Street Property and by guarantees and mortgages against property owned by numerous other 655 Affiliates. Framingham Cooperative Bank provided senior construction financing to SOS secured by a first mortgage against the Washington Street Property.

58.     In total, LBM purports to have loaned SOS approximately $1,800,000 *after* the LBM/655 Note was in default.

59.     Upon information and belief, SOS sold approximately 16 condominium units at the Washington Street Property prior to its bankruptcy filing. Pursuant to a written intercreditor agreement, upon the sale of each condominium at the Washington Street Property, Framingham Cooperative Bank and LBM were each paid a portion of the sale proceeds on account of their respective mortgage loans.

60.     Taking full advantage of a powerless borrower, in connection with each of the partial releases obtained by SOS, Mallegni demanded from SOS and was paid an additional, personal fee of $5,000 upon the sale of each condo unit, including but not limited to, Units 101, 103, 104, 107, 202, 204, 302, 303, which were sold between August 31 and September 16, 2005. These personal fees were extorted from SOS even though LBM's loan documents do not provide for such fees.

14.

**The Quincy Condominium**

61. In August 2004, well after the LBM/655 Note matured and was in default, Norris informed Laverty that if he (Laverty) did not assist in the purchase of a condominium for Norris' daughter, Heidi, he (Norris) would ensure that LBM would provide no more funding or forbearance to 655 Corp. or any 655 Affiliate for any of their developments.

62. Acquiescing to Norris' demand, on August 31, 2004, Laverty purchased a residential condominium located at Unit D-8, 123 Elm Street, Quincy, Massachusetts (the "Quincy Condominium") for $175,000. Later that same day, Laverty sold the Quincy Condominium to Heidi Norris. Although the deed currently on record states that Heidi Norris paid Laverty $165,000 for the Quincy Condominium (only $10,000 less than Laverty paid that same day), upon information and belief, Heidi Norris only paid Laverty $150,000 for the Quincy Condominium.

63. Salem Five Cents Savings Bank loaned Heidi Norris $160,000 to purchase the Quincy Condominium, which upon information and belief, is more than 100% of the purchase price she actually paid for the property.

64. Norris represented <u>both</u> Heidi Norris and Salem Five Cents Savings Bank in connection with the Quincy Condominium transaction.

65. At the time of the Quincy Condominium closings, the LBM/655 Note was in default and LBM was refusing to acknowledge its prior agreement to discharge the Foundry Mortgage or the mortgages against Laverty's and Fraine's homes upon completion of the elevator and lobby at the East Second Street Property. Under the circumstances, Laverty was in no position to refuse Norris' illegal and outrageous demands.

**The Pine Banks Foreclosure**

BOS-1274694 v3

66. In early 2005, Foundry Realty defaulted on its loan obligations to Pine Banks. On or about July 7, 2005, Pine Banks foreclosed upon the Pine Banks Mortgage. Pine Banks was the highest bidder at the foreclosure auction.

67. LBM had notice of the 2005 foreclosure by Pine Banks, yet made no effort to communicate with Pine Banks.

68. Following its foreclosure sale, Pine Banks sold the Foundry Property to Steven Ross, as Trustee of the 14 Beach Street Realty Trust. The Beach Street Trust later conveyed the Foundry Property to Shamus on July 19, 2007.

**LBM Attempts to Foreclose on the LBM Mortgage.**

69. Nearly two years following the foreclosure sale of the Foundry Property by Pine Banks, and notwithstanding (i) the agreement by LBM to subordinate its mortgage to the Pine Banks mortgage and (ii) its further agreement to discharge the Foundry mortgage when the elevator and lobby were complete at the East Second Street property, LBM initiated foreclosure proceedings against the Foundry Property and scheduled an auction sale of the property for July 26, 2007. The foreclosure sale was preempted by Shamus' bankruptcy filing on July 25, 2007. LBM has not recorded an extension, acknowledgement or affidavit indicating that its mortgage against the Foundry Property has not been satisfied.

**Mallegni's Pervasive Control Over 655 Corp. and the 655 Affiliates**

70. For a variety of reasons, including the systematic diversion of funds by 655 Corp., Fraine and others, the condominium projects at East Second Street, Washington Street (owned by SOS), West First Street (owned by Geneva) and Main Street in Hyannis (owned by Hibel) stalled and in some cases were foreclosed upon. 655 Corp., The Geneva LLC and SOS Realty LLC each filed Chapter 11 petitions in this Court (655 Corp; Case No. 03-13020; The Geneva

16.

LLC; Case No. 06-1138; and SOS Realty LLC, Case No. 06-11854).

71. In order to quietly maintain control over these developments while they attempted to "reorganize", Mallegni installed his former lawyer and long time business partner DiMento as the Manager of 655 Corp., SOS Realty and Hibel. Attorney DiMento continued to serve in that role for 655 Corp., at least until he was displaced by a Chapter 11 trustee.

## COUNT I

### (Obsolete Mortgage – M.G.L. c. 260, §33)

72. Shamus realleges and repeats the allegations contained in paragraphs 1 through 71 above and by reference incorporates them herein.

73. Shamus hereby objects to LBM's Claim pursuant to M.G.L. c. 260, §33, which provides as follows:

> A power of sale in any mortgage of real estate shall not be exercised and an entry shall not be made nor possession taken nor proceeding begun for foreclosure of any such mortgage after the expiration of, in the case of a mortgage in which no term of the mortgage is stated, 35 years from the recording of the mortgage or, in the case of a mortgage in which the term or maturity date of the mortgage is stated, 5 years from the expiration of the term or from the maturity date, unless an extension of the mortgage, or an acknowledgment or affidavit that the mortgage is not satisfied, is recorded before the expiration of such period. In case an extension of the mortgage or the acknowledgment or affidavit is so recorded, the period shall continue until 5 years shall have elapsed during which there is not recorded any further extension of the mortgage or acknowledgment or affidavit that the mortgage is not satisfied. The period shall not be extended by reason of non-residence or disability of any person interested in the mortgage or the real estate, or by any partial payment, agreement, extension, acknowledgment, affidavit or other action not meeting the requirements of this section and sections 34 and 35. Upon the expiration of the period provided herein, the mortgage shall be considered discharged for all purposes without the necessity of further action by the owner of the equity of redemption or any other persons having an interest in the mortgaged property and, in the case of registered land, upon the payment of the fee for the recording of a discharge, the mortgage shall be marked as discharged on the relevant memorandum of encumbrances in the same manner as for any other mortgage duly discharged.

74. The term of the LBM Mortgage expired on September 9, 2003. Between the date the LBM Mortgage was recorded through at least January 7, 2009, LBM has not recorded an

17.

extension of the mortgage, acknowledgement or affidavit indicating that the LBM Mortgage was not satisfied.

75.     As a result, the LBM Mortgage shall be considered discharged for all purposes without the necessity of further action by the owner of the equity of redemption or any other persons having an interest in the Foundry Property.

76.     Because (i) the Debtor is not obligated under the Foundry Guaranty, and (ii) the LBM Mortgage is now obsolete and discharged under G.L. c. 260, §33, the LBM Claim must be disallowed.

## COUNT II

### (Recharacterization)

77.     Shamus realleges and repeats the allegations contained in paragraphs 1 through 76 above and by reference incorporates them herein.

78.     The LBM/655 Note should be recharacterized as equity.

79.     Development of the East Second Street Property was a joint venture between Mallegni and the other shareholders of 655 Corp.  Mallegni, the managing member of LBM, was an insider of 655 Corp. when the LBM/655 Note was issued.  He was a shareholder and the party who exclusively controlled 655 Corp. as trustee of the 655 Trust.  Mallegni maintained control over 655 Corp. until the Court appointed a Chapter 11 trustee.

80.     General Bank, an outside lender, was unwilling to make a construction loan to 655 Corp. without the infusion of $1,200,000 in equity.

81.     LBM and 655 Corp. executed loan documents on May 9, 2003, but no actual loan was made.

82.     The LBM/655 Note was not treated as a loan either by LBM or 655 Corp.

83.     The LBM/655 Note had payment provisions, but 655 Corp. never made any

18.

payments on the LBM/655 Note.

84.     Even though the development and sale of the East Second Street Property would take several years, the LBM/655 Note had a term of only four months.

85.     Mallegni, through LBM, continued to loan money to 655 and its affiliates long after the LBM/655 Note was in default.

86.     Accordingly, the LBM Claim should be disallowed to the extent that it relies upon the LBM/655 Note and/or the LBM Mortgage.

## COUNT III

### (Failure of Consideration)

87.     Shamus realleges and repeats the allegations contained in paragraphs 1 through 86 above and by reference incorporates them herein.

88.     The Foundry Guaranty and the underlying LBM Mortgage on the Foundry Property fail for lack of consideration.  Absent consideration, the Foundry Guaranty and the LBM Mortgage are void or voidable.

89.     Accordingly, the LBM Claim should be disallowed to the extent that it relies upon the Foundry Guaranty and/or the LBM Mortgage.

**WHEREFORE**, Shamus Holdings, LLC respectfully requests that this Court enter an order granting Shamus the following relief:

1.      Disallowing the LBM Claim in its entirety;

2.      Directing LBM to immediately execute and deliver to Shamus such documents as are necessary to discharge the LBM Mortgage; and

3.      Granting such other and further relief as this Court deems just and proper.

19.

SHAMUS HOLDINGS, LLC,
By its counsel,

*/s/ Charles A. Dale III*
Charles A. Dale III, BBO #558839
Mackenzie L. Shea, BBO #666241
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
617-261-3100

SPECIAL LITIGATION COUNSEL,

*/s/ David M. Ianelli*
David M. Ianelli, BBO #567274
Kara A. Lynch, BBO #659920
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, MA  02110
617-449-6500

January 21, 2009